958 So.2d 284 (2007)
Tammy MAXWELL, Individually, and for and on behalf of the wrongful death Beneficiaries of Keith W. Maxwell, Deceased, Appellant.
v.
BAPTIST MEMORIAL HOSPITAL-DESOTO, INC., and Robert Shriner, M.D., Appellees.
No. 2006-CA-00440-COA.
Court of Appeals of Mississippi.
June 5, 2007.
*285 Dana J. Swan, Clarksdale, attorney for appellant.
Walter Alan Davis, Oxford, for Baptist Memorial Hospital-Desoto, Inc.
S. Duke Goza, for Robert Schriner, M.D.
Dion Jeffery Shanley, for Robert Schriner, M.D.
Before KING, C.J., IRVING and ROBERTS, JJ.
KING, C.J., for the Court.
¶ 1 Tammy Maxwell, individually and for and on behalf of the wrongful death beneficiaries of Keith W. Maxwell, deceased appeals the trial court's order granting summary judgment to Baptist Memorial Hospital-DeSoto, Inc. and Dr. Robert Schriner, M.D[1]. The trial court held that Baptist-DeSoto and Schriner were entitled to summary judgment as a matter of law because Maxwell failed to present necessary expert testimony evidence regarding the standard of care and breach of that standard of care. Finding no error, this Court affirms.

FACTS
¶ 2 At the time of his death on June 4, 2001, Keith Maxwell was a forty-two year old male with a history of diabetes and obesity. His wife, Tammy Maxwell, testified in her deposition that Keith's health problems forced him to quit work approximately six to eight months prior to his death. Specifically, Tammy testified that due to a lack of sleep caused by sleep apnea and pain in his legs which kept him from standing for long periods of time, Keith was no longer able to work. He spent most of his time sitting in a recliner and would occasionally help Tammy with the children who attended her in-home day care business.
¶ 3 Prior to June 1, 2001, Keith was under the care of Dr. Michael Edward Steuer and Dr. Winston Craig Clark for pain management. Despite a veritable cocktail of prescription pain medications, including Oxycontin, Keith was unable to keep his pain at a manageable level. His doctors determined that a "dorsal column stimulator" would assist Keith in controlling his pain and would help reduce the number of pain medications necessary for pain management. His doctors scheduled the outpatient procedure for June 1, 2001.
¶ 4 Dr. Clark performed the outpatient procedure on June 1, 2001 at Baptist Memorial Hospital-DeSoto. Following the surgery, Dr. Clark referred Keith to Dr. Steuer for pain management. Among the other medications that Dr. Steuer prescribed was a dosage of 160 mg. of Oxycontin to be given every twelve hours. The nursing staff at Baptist-DeSoto misread the order, and Keith received four doses of Oxycontin, totaling 640 mg., within a seven-hour period. According to the toxicology report completed as part of Keith's autopsy, more than 200 mg. is considered toxic.
¶ 5 As a result of the overdose, Keith became lethargic and began experiencing difficulty breathing. The staff at Baptist-DeSoto contacted Dr. Robert Schriner, the pulmonologist on call, at approximately 9:25 a.m. on June 2, 2001. Dr. Schriner was completing rounds at Baptist East *286 hospital at the time and was not on campus at Baptist-DeSoto. After being fully briefed on the situation, including the results of an arterial blood gas test, Dr. Schriner ordered a standard dosage of Narcan, to be administered intravenously, and a breathing treatment to open up Keith's airways and allow him to breathe more deeply. Dr. Schriner also ordered a follow-up arterial blood gas test to compare with the first so that he could determine whether the current course of treatment was working to reverse the overdose of Oxycontin.
¶ 6 Dr. Schriner received a follow-up call from the Baptist-DeSoto staff at 10:40 a.m. The nurse informed Dr. Schriner that the patient was improving significantly and that the follow-up arterial blood gas test indicated that Keith's oxygen level had more than doubled.
¶ 7 Dr. Schriner met with Keith around 2:30 p.m. for an examination. Dr. Schriner testified in his deposition that Keith was "stable from a respiratory standpoint." Keith was complaining about muscle spasms and pain in his back. Dr. Schriner cautioned against the use of additional narcotics, given the recent Oxycontin overdose. Dr. Schriner did not order additional doses of Narcan following the examination because Keith "was felt to be back to his baseline status both respiratory and mental status-wise." The hospital records also reflect that by 8:00 p.m. on June 2, 2001, Keith was alert and oriented and his respiration was "even and unlabored."
¶ 8 Keith was released from the hospital on June 3, 2001. At the time of his discharge, the hospital records indicate that he was alert and able to provide for his own self-care. Tammy testified in her deposition that Keith called her the morning of June 3 and told her that he was being discharged. She further testified that after he arrived home from the hospital, Keith watched a movie, ate dinner, and went to bed early because he was tired. Keith had complained of pain, and after a phone call to Dr. Friedman, obtained a prescription for Tylenol 3. Tammy picked up the prescription and administered one dose to Keith. She also stated that the next morning, Keith woke early and asked for breakfast. She helped him in and out of the shower. He then told her that he was nauseous and tired and requested that she keep his breakfast warm so that he could eat later. He also told her that she should run errands while he took a nap. Tammy testified that she paid the electric bill and picked up a few things at a store before calling to check on Keith. When he did not answer the phone at home, she drove home to check on him and found him dead.
¶ 9 The state medical examiner performed an autopsy. The toxicology report conducted as part of the autopsy revealed that Keith had 770 mg of Oxycontin in his system at the time of his death. Tammy testified that she had not given Keith any Oxycontin since his release from the hospital. During oral argument, however, counsel for Tammy admitted that Keith obviously took some unknown amount of Oxycontin after his discharge from the hospital.

PROCEDURAL HISTORY
¶ 10 Tammy subsequently brought suit against Baptist-DeSoto, Dr. Steuer, Dr. Clark, Dr. Friedman, Dr. Schriner, and John Does 1-10. Her complaint alleged gross negligence, res ipsa loquitor, and breach of contract. According to the docket sheet, Drs. Steuer, Clark, and Friedman were dismissed at various times throughout *287 the proceedings in the trial court.[2]
¶ 11 Following discovery, both Baptist-DeSoto and Dr. Schriner submitted motions for summary judgment. The trial court granted Baptist-DeSoto's motion for summary judgment. Following a motion for reconsideration, the trial court entered an order granting summary judgment to both Baptist-DeSoto and Dr. Schriner. In that order, the trial court held that "[t]he Plaintiffs must put forth expert testimony" to establish the applicable standard of care, breach of that standard of care, causation, and damages.
¶ 12 With regard to expert testimony, the trial court held that Tammy submitted only the written opinion of Dr. Stephen Hayne, the medical examiner who conducted the autopsy on Keith. The trial court identified several problems with his written opinion. First, this opinion was drafted by counsel for Tammy. Dr. Hayne did acknowledge the opinion in his deposition testimony and did testify that he adopted the contents of that written opinion; however, the opinion was not submitted in affidavit form, nor was it sworn. Additionally, Dr. Hayne clearly testified that he was a fact expert witness only and had not been retained by the plaintiffs as an expert witness because he chose not to be. Despite the deficiencies in form, however, the trial court considered the opinion testimony. The trial court concluded that Dr. Hayne's opinion testimony failed to "define the standard of care and who breached it and how it was breached." Moreover, the trial court noted that Dr. Hayne gave his personal opinion and refused to opine on the generally accepted standards of care applicable to the case.
¶ 13 The trial court held that Dr. Hayne's opinion was insufficient to create a genuine issue of material fact. The trial court further held that, as a matter of law, Baptist-DeSoto and Dr. Schriner were entitled to summary judgment. Tammy timely appealed.

STANDARD OF REVIEW
¶ 14 Under Mississippi Rule of Civil Procedure 56(c), summary judgment is granted to a party when "the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). This Court reviews a trial court's order granting summary judgment under the de novo standard of review. See Saucier ex rel. Saucier v. Biloxi Reg'l Med. Ctr., 708 So.2d 1351, 1354 (¶ 10) (Miss.1998). The Court "must examine all the evidentiary matters before [it]." Monsanto Co. v. Hall, 912 So.2d 134, 135 (¶ 5) (Miss.2005). The burden is on the moving party to establish that there is no material issue of fact, and the evidence must be viewed in the light most favorable to the non-moving party. See Hartford Ins. Co. v. Sheffield, 808 So.2d 891, 895 (¶ 11) (Miss.2001).

ANALYSIS
¶ 15 On appeal, Tammy raises two issues in arguing that the trial court erred in granting summary judgment to Baptist-DeSoto and Dr. Schriner. First, Tammy argues that the trial court failed to consider the expert report and deposition testimony of Dr. Hayne. Second, she argues that the report and testimony created a *288 material issue of fact that precluded summary judgment.
I. The trial court's consideration of Dr. Hayne's report and testimony
¶ 16 Tammy argues that the trial court failed to consider Dr. Hayne's report and testimony. Both Baptist-DeSoto and Dr. Schriner argue that procedurally, Dr. Hayne's opinion was not presented in the proper format. Specifically, Dr. Hayne's opinion consisted of an unsigned report prepared by Tammy's counsel and Dr. Hayne's deposition testimony that he adopted the findings contained in that report. In its order, the trial court notes that Dr. Hayne's opinion "is not in affidavit form and not sworn." Following that statement, however, the trial court proceeded to consider the evidentiary value of Dr. Hayne's opinion.
¶ 17 Because this Court finds that the trial court considered Dr. Hayne's report and testimony, despite the procedural irregularities, the Court holds that this issue is without merit.
II. The value of Dr. Hayne's report and testimony
¶ 18 Tammy's theory of the case appears to be that Baptist-DeSoto's nursing staff, by administering improper doses of Oxycontin, failed to provide the proper standard of care, thereby contributing to Keith's death. With regard to Dr. Schriner, Tammy contends that Dr. Schriner breached the applicable standard of care by failing to conduct a baseline test that would have established the amount of Oxycontin in Keith's system. She further argues that because of his failure to order the baseline test, Dr. Schriner's treatment of Keith, which was conducted using the clinical recommendations, constituted a breach of duty that caused Keith's death.
¶ 19 In their motions for summary judgment, both Baptist-DeSoto and Dr. Schriner argued that Tammy failed to provide expert testimony regarding the applicable standard of care and the manner in which Baptist-DeSoto and Dr. Schriner breached that standard of care. Substantively, Baptist-DeSoto and Dr. Schriner argue that Dr. Hayne's opinion constitutes his personal opinion only and not the expert opinion required for medical malpractice cases. They contend that Dr. Hayne's personal opinion is insufficient to establish evidence of the duty owed to Keith, the manner in which that duty was breached, and causation.
¶ 20 Expert testimony plays a significant role in medical malpractice cases because "[a]bsent error so obvious that a layman could easily determine fault, expert testimony is generally required to survive summary judgment and establish the negligence of a physician." Sheffield v. Goodwin, 740 So.2d 854, 856 (¶ 6) (Miss. 1999). Generally, a plaintiff cannot prevail in a medical malpractice action without establishing, "by expert testimony, the standard of acceptable professional practice; that the defendant physician deviated from that standard; and that the deviation from the standard of acceptable professional practice was the proximate cause of the injury of which plaintiff complains." Brown v. Baptist Mem'l Hosp.-DeSoto, Inc., 806 So.2d 1131, 1134 (¶ 10) (Miss. 2002) (citation omitted). See also Cheeks v. Bio-Medical Applications, Inc., 908 So.2d 117, 120 (¶ 8) (Miss.2005) (citations omitted); Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1355 (Miss.1990).
¶ 21 Arguably, it is possible that establishing the duty and breach of duty with regard to Baptist-DeSoto does not require expert testimony. In this case, Tammy argues that Baptist-DeSoto is responsible for her husband's death because the nursing *289 staff administered an overdose of Oxycontin to Keith in violation of the treating physician's orders. Certainly, a lay person could understand, without benefit of expert testimony, that a hospital's nursing staff has a duty to read a patient's chart carefully and to follow the care instructions on that chart. Additionally, the actual administration of 640 mg. of Oxycontin within a seven-hour period, as opposed to the recommended administration of 160 mg. of Oxycontin every twelve hours, is evidence that establishes a breach of duty in a manner that does not require expert testimony.
¶ 22 Under Tammy's theory of the case, however, expert testimony would be necessary to establish causation because the hospital was able, through Dr. Schriner's intervention, to resolve the overdose. Tammy fails to show how the nursing staff's error on June 1, 2001, caused her husband to die of an Oxycontin overdose three days later on June 4, 2001, when he was alert and oriented as early as 8:30 p.m. on June 2, 2001, and at the time of his discharge on June 3, 2001. Expert testimony would have been necessary to establish causation because the evidence, including Tammy's own deposition testimony, indicated that Keith recovered from the overdose after Dr. Schriner treated him.
¶ 23 With regard to Dr. Schriner, however, expert testimony would be necessary to establish duty, breach of duty, and causation. Tammy's theory of the case was that by failing to order baseline testing at the time Dr. Schriner began treating Keith, Dr. Schriner violated the applicable standard of care. She further argued that Dr. Schriner's care was deficient because he followed clinical recommendations regarding the proper dosage of Narcan to treat the Oxycontin overdose rather than establishing the perimeters for treatment by a baseline test that tracked Keith's individual reaction to the overdose. Without expert testimony explaining the necessity of such a test so that it created a duty, under the circumstances and taking into account the facilities available to Dr. Schriner at the time of treatment, it would not be clear to a jury that Dr. Schriner owed such a duty or that he breached that duty. Additionally, expert testimony would be necessary to establish causation, as the evidence indicates that Keith responded quickly and positively to Dr. Schriner's treatment.
¶ 24 The parameters that define a physician's duty generally are well established and are stated as follows:
given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.
Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985). This standard is an objective standard. Accordingly, an expert must articulate the standard of care that should have been applied in a particular case as an objective standard in order to establish the duty owed to the patient.
¶ 25 In the case sub judice, Dr. Hayne stated in his deposition testimony that he was participating in this case as an expert fact witness only. He clearly articulated that he was not testifying as an expert witness and that he had not been retained by Tammy as an expert because he chose not to be. When questioned repeatedly about the standard of care, Dr. Hayne framed his answers subjectively, answering *290 the question in terms of what he would do as the physician in that particular situation. At no time in his deposition testimony or in the "report" that he adopted in his deposition testimony did Dr. Hayne articulate an objective standard, either for Baptist-DeSoto or for Dr. Schriner.
¶ 26 Because Dr. Hayne's "report" and deposition testimony are not objective, the trial court correctly concluded that Dr. Hayne's testimony did not sufficiently establish the duty owed, breach of that duty, or causation for either Baptist-DeSoto or Dr. Schriner. Tammy presented no other expert testimony. Accordingly, her claims fail as a matter of law, and the trial court properly granted summary judgment to both Baptist-DeSoto and Dr. Schriner. See Sheffield, 740 So.2d at 856 (¶ 6).
¶ 27 THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] The complaint spells the doctor's last name as "Shriner." The correct spelling, however, is "Schriner."
[2] Dr. Clark was dismissed as a result of the entry of an agreed order dated March 6, 2003. The docket entry indicates that Dr. Friedman was dismissed without prejudice on July 30, 2003, but the docket does not indicate that Tammy ever amended her complaint to add him as a defendant. Dr. Steuer was dismissed with prejudice on May 10, 2005.