970 So.2d 273 (2007)
Roosevelt THOMAS, As Next Friend and on Behalf of All Wrongful Death Beneficiaries of Ada Mae Thomas, Deceased, Appellant
v.
GREENWOOD LEFLORE HOSPITAL and William B. Harper, D.O., Appellees.
No. 2006-CA-00377-COA.
Court of Appeals of Mississippi.
December 11, 2007.
*274 Dennis C. Sweet, III, Jackson, Warren Louis Martin, Jr., attorneys for appellant.
Gaye Nell Currie, L. Carl Hagwood, Jackson, Jason E. Dare, Greenville, attorneys for appellees.
EN BANC.
KING, C.J., for the Court.
¶ 1. Roosevelt Thomas, as next friend and on behalf of the wrongful death beneficiaries of Ada Mae Thomas, deceased, appeals the trial court's order granting summary judgment to Greenwood Leflore Hospital and William B. Harper, D.O. He alleges that there were genuine issues of material fact before the trial court that should have precluded summary judgment. We find no error and affirm.

FACTS
¶ 2. On August 15, 2001, at approximately 2:25 p.m., Ada Mae Thomas arrived at Greenwood Leflore Hospital complaining of left side pain, burning upon urination, and vomiting. Dr. William Harper was the on-duty emergency room physician at the time. Dr. Harper met with Mrs. Thomas and discussed her symptoms. He then ordered a number of different tests to determine the cause of her illness.
¶ 3. Included in the array of tests ordered were an amylase, complete blood count, and a urinalysis. After the return of these tests, Dr. Harper determined that Mrs. Thomas needed further testing and ordered an intravenous pyelogram (IVP). Prior to the return of the IVP, Dr. Harper went off-duty as his twelve-hour shift in the emergency room ended at 5:00 p.m.
¶ 4. Prior to going off-duty, Dr. Harper turned Mrs. Thomas's care over to Dr. Michael Stokes, the oncoming emergency room physician. After the IVP had been completed, Dr. Stokes discharged Mrs. Thomas in stable condition around 6:50 p.m. with a prescription for 800 mg of Ibuprofen and instructions to follow up *275 with her primary care physician for renal stones.
¶ 5. On August 17, 2001, Nurse Barbara Nevels telephoned Mrs. Thomas to remind her to follow-up with her primary care physician. Mrs. Thomas told Nurse Nevels that she had an appointment scheduled for August 20, 2001, with Dr. Hardin, but that she was not feeling well and might return to the emergency room. Nurse Nevels told Mrs. Thomas to return to the emergency room if needed, but to keep her appointment with Dr. Hardin.
¶ 6. On August 19, 2001, Mrs. Thomas returned to the Greenwood Leflore Hospital emergency room in a very ill state. She was admitted to the Intensive Care Unit by Dr. Mark Byrd where she died on August 20, 2001.

PROCEDURAL HISTORY
¶ 7. Roosevelt Thomas filed his complaint on August 8, 2002, alleging a wrongful death action against Dr. Harper, Nurse Nevels, Greenwood Leflore Hospital, and a number of John Does. The defendants filed their answer on August 21, 2002, along with their first discovery requests.
¶ 8. Included in the discovery requests were requests regarding expert witnesses. Thomas objected to these specific requests. Dr. Harper filed a motion to compel on April 1, 2003, which was granted by order dated April 23, 2003. On April 24, 2003, Thomas filed his expert designation, designating Dr. William Truly as his expert. The designation included, among other things, the nature of Dr. Truly's proposed testimony.
¶ 9. On August 13, 2003, in the midst of discovery, a stay was entered for six months due to the insolvency of Greenwood Leflore Hospital's insurance provider. After the stay had been lifted, on November 11, 2004, the defendants each filed separate motions for summary judgment. The trial court denied them as premature on March 14, 2005, and ordered that the depositions of Dr. Harper and Nurse Nevels should be taken. Dr. Harper gave his deposition on May 11, 2005, while Nurse Nevels's deposition was rescheduled numerous times without being completed.
¶ 10. On July 11, 2005, the defendants again filed separate motions for summary judgment. Thomas responded to Dr. Harper's motion and attached an unsigned affidavit to the response. No written response to Greenwood Leflore Hospital's motion for summary judgment can be found in the record.
¶ 11. A hearing on the motion was held on December 5, 2005. Then, by order dated January 31, 2006, the trial court granted defendants' motions for summary judgment. Aggrieved, Thomas appealed.

STANDARD OF REVIEW
¶ 12. Under Mississippi Rule of Civil Procedure 56(c), summary judgment may be granted to a party when "the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This Court reviews a trial court's granting of summary judgment de novo. Maxwell v. Baptist Mem'l Hosp.-Desoto, Inc., 958 So.2d 284, 287(¶ 14) (Miss.Ct.App.2007). "The burden is on the moving party to establish that there is no material issue of fact, and the evidence must be viewed in the light most favorable to the non-moving party." Id. However, the non-moving party must be diligent in opposition to a motion for summary judgment and "may not rely upon the mere unsworn allegation in his pleadings." Magee v. Transcon. Gas Pipe Line Corp., 551 *276 So.2d 182, 186 (Miss.1989). Specifically, the non-moving party may not create an issue of genuine fact through briefs and argument alone. Id.

ANALYSIS
¶ 13. Thomas alleges that there were three genuine issues of material fact that should have prevented the trial court's grant of summary judgment. Thomas's issues include the following: (1) Dr. Harper breached the standard of care by failing to properly communicate Mrs. Thomas's condition to the incoming physician; (2) Dr. Harper breached the standard of care by failing to ensure that Mrs. Thomas was admitted to the hospital; and (3) Nurse Nevels breached the standard of care by failing to admonish Mrs. Thomas to return to the hospital upon hearing of her condition. We now address each allegation of material fact in turn.
I. Whether Dr. Harper breached the standard of care by failing to properly communicate Mrs. Thomas's condition to the incoming physician.
¶ 14. Thomas argues that Dr. Harper breached his standard of care by failing to communicate Mrs. Thomas's condition to Dr. Stokes, the oncoming emergency room physician. Also, Thomas claims that had Dr. Harper explained the severity of the condition to Dr. Stokes, Dr. Stokes would have had Mrs. Thomas admitted to the hospital.
¶ 15. Generally in a medical malpractice case, the plaintiff must present expert medical testimony as to the standard of care, whether that standard was breached, whether the breach caused the plaintiff's injury, and the extent of the damages. Phillips ex rel. Phillips v. Hull, 516 So.2d 488, 491 (Miss.1987). There is an exception when the elements would be within the knowledge of a layperson. Id. Thomas alleges in his brief that his expert, Dr. Truly, was prepared to testify to the standard of care that should have been followed and that Dr. Harper breached the standard of care. However, this information was not presented to the trial court in the form of an affidavit or even in the expert designation. Thomas can not create a material issue of fact through arguments and assertions in briefs. Id. Therefore, we must look elsewhere in the record to determine if the standard of care was defined and whether there is a question as to whether Dr. Harper breached that standard.
¶ 16. The only other place in the record where the standard of care as to Dr. Harper's communication to Dr. Stokes is found in Dr. Harper's sworn deposition. When asked what the standard of care was, he stated that it was "to get the charts together, get the records up to date, discuss the patient's history, physical findings and condition and concerns with the oncoming physician." He then stated that he did comply with the standard of care. Even viewing the evidence in the light most favorable to Thomas, the only evidence in the record as to this issue is that Dr. Harper met the standard of care when he turned Mrs. Thomas's care over to Dr. Stokes.
¶ 17. Therefore, this allegation of material fact is without merit.
II. Whether Dr. Harper breached the standard of care by failing to ensure that Mrs. Thomas was admitted to the hospital.
¶ 18. The trial court stated in its order that "based on the fact that Dr. Harper was not present at the time Mrs. Thomas's final test results were returned or at the time of her discharge and given the fact that Dr. Harper does not have admitting privileges, [the court] finds that *277 Dr. Harper is entitled to judgment as a matter of law." Thomas alleges that Dr. Harper should have hospitalized Mrs. Thomas prior to going off-duty. He points to an unsworn affidavit that was attached to his response to the motion for summary judgment for support. The affidavit stated, "Even if Mrs. Thomas was under Dr. Harper's care for three hours, he still had sufficient medical facts and data before him to conclude that Mrs. Thomas would have a serious negative outcome without appropriate and immediate medical intervention including hospitalization." Dr. Harper counters by stating that the affidavit was not and should not have been relied upon by the trial court. We agree with Dr. Harper.
¶ 19. The supreme court has held that "the only unsworn matters available to a party opposing the motion [for summary judgment] are undenied allegations in his pleadings and admissions secured under Rule 36, Miss.R.Civ.P." Magee, 551 So.2d at 186. The opinion goes on to say that for a document to have the power to create a genuine issue of material fact, it "must, first, be sworn; second, be made upon personal knowledge; and third, show that the party giving them is competent to testify." Id. The affidavit that Thomas relies upon was never even signed by Dr. Truly, much less sworn to by him. An affidavit is "a voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Blacks Law Dictionary 58 (7th Edition 1999). The affidavit appears to be a standard form affidavit, but without being sworn it cannot create an issue of material fact. For our purposes it is merely a piece of paper with the word "affidavit" as its title.
¶ 20. Therefore, we must look to the rest of the record to determine if an issue of material fact was created by the defendant. The only other place in the record which stated that Dr. Harper should have hospitalized Mrs. Thomas came from Thomas's expert designation. It stated that after the tests including the IVP came back, the "emergency room physician could have, at the very least, hospitalized this patient." After further discovery, it became uncontested that Dr. Harper was not on-duty when Mrs. Thomas was taken to have an IVP, much less when the results were returned. According to Thomas's expert designation, no duty to hospitalize Mrs. Thomas had arisen before all the test results had been returned. Hence, Dr. Harper had no duty to hospitalize Mrs. Thomas since he was off-duty at that time.
¶ 21. Since the affidavit that Thomas attached to his response to the motion for summary judgment was not even attested, it cannot be said to create an issue of material fact. Also, the remainder of the record fails to create a genuine issue of material fact as to this allegation. Therefore, this allegation of material fact is without merit.
III. Whether Nurse Nevels breached the standard of care by failing to admonish Mrs. Thomas to return to the hospital upon hearing of her condition.
¶ 22. Thomas's final allegation of material fact is that Nurse Nevels should have "admonished" Mrs. Thomas to return to the emergency room. Further, he claims that had she admonished Mrs. Thomas to return to the emergency room, Mrs. Thomas would have returned immediately and received the proper medical care. He alleges that Nurse Nevels had the knowledge and information to recognize Mrs. Thomas's condition and its severity. Thomas recognizes that expert testimony would be needed to testify to *278 the appropriate standard of care and alleges that his expert, Dr. Truly, would be able to testify to the standard and its breach.
¶ 23. After a thorough review of the record, this Court cannot find any affidavit or pleading that stated Nurse Nevels breached a standard of care. Neither can we find anything in the record as to the standard of care that Nurse Nevels should have followed. The primary discussion of Nurse Nevels's conduct comes from the brief and pleadings of Greenwood Leflore Hospital. The Hospital's pleadings at trial discuss an affidavit from Dr. Truly that spoke of Nurse Nevels's conduct, but this affidavit is not found anywhere within the record. "The burden rested upon [Thomas] to see to it that the record contained all data essential to an understanding and presentation of matters relied upon for reversal on appeal." Dew v. Langford, 666 So.2d 739, 746 (Miss.1995) (quoting Shelton v. Kindred, 279 So.2d 642, 644 (Miss. 1973)). Since this did not occur, we find this referenced affidavit of no consequence.
¶ 24. The only other reference to Nurse Nevels's conduct can be found in Thomas's expert designation. There, Thomas acknowledged that Nurse Nevels told Mrs. Thomas "to return to the hospital if need be, but that she needed to keep her appointment with Dr. Hardin on Monday."
¶ 25. Since Thomas cannot merely rest on his allegations and assertions in his brief, there must be something in the record that would constitute a material fact in regard to Nurse Nevels. Here, the only thing in the record is a reference that she did tell Mrs. Thomas to return to the emergency room if need be. Since the standard of care of what a nurse should do in that situation is beyond the knowledge of a layman, expert testimony would be needed. Phillips, 516 So.2d at 491. The record does not contain any such affidavit by Thomas's expert as to the standard of care, much less a breach of such a standard.
¶ 26. Therefore, this allegation of material fact is without merit.

CONCLUSION
¶ 27. Each of Thomas's allegations of genuine issue of material fact is unsupported by the record and without merit. Therefore, the trial court properly granted summary judgment to both Dr. Harper and Greenwood Leflore Hospital.
¶ 28. THE JUDGMENT OF THE LEFLORE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION. BARNES, J., NOT PARTICIPATING.
IRVING, J., Dissenting.
¶ 29. The majority finds that summary judgment was properly granted in favor of Greenwood Leflore Hospital and William B. Harper, D.O., because Roosevelt Thomas, the plaintiff in the court below, failed to present expert testimony as to the standard of care and breach of that standard.[1] I believe that Thomas met his burden of proof and that there are genuine issues of material fact in this case that require resolution *279 by a jury. Therefore, I dissent. I would reverse and remand this case for a trial on the merits.
¶ 30. In granting the hospital's and Dr. Harper's separate motions for summary judgment, the trial judge opined:
This Court, based on the fact that Dr. Harper was not present at the time Mrs. Thomas' final test results were returned or at the time of her discharge and given the fact that Dr. Harper does not have admitting privileges, finds that Dr. Harper is entitled to judgment as a matter of law and that this motion shall be granted and all claims against him shall be dismissed with prejudice. The Court further finds that GLH is entitled to judgment as a matter of law and that its motion shall be granted and all claims against it shall be dismissed with prejudice. This decision is based on the facts that Nurse Nevels was not a doctor and could not diagnose Mrs. Thomas with having any medical conditions, that Nurse Nevels did instruct Mrs. Thomas to return to the emergency room if needed, and that the Court has determined Dr. Harper is entitled to judgment in his favor, therefore, GLH cannot be held vicariously liable for their actions.
¶ 31. It is clear from the quoted passage that the trial judge did not base his decision to grant summary judgment on the absence of an affidavit from Thomas in opposition to Dr. Harper's and the hospital's motions for summary judgment. Further, it also is clear from the record that Dr. Harper's attorney[2] did not premise his motion for summary judgment on the lack of an affidavit from Thomas's designated expert. The record reflects the following colloquy at the beginning of the hearing on the motion for summary judgment:
BY MR. HAGWOOD: An IVP is testing the patient to determine kidney functions, and that's what this test was for. On Page 33, he testifies, "I had left the emergency department; turned over care to someone else before she's even taken to the x-ray department to have the IVP." Page 34, Line 17, "I turned it over to Dr. Stokes and the usual process; took the chart; went over the chart with him; explained what she presented with; what I had done; and the tests I ordered."
Now, this is the key to our getting summary judgment in this case is Page 60, Line 5. "As an emergency room physician, I don't  or any emergency room physician at the hospital does not have admitting privileges to admit patients to the floor." Line 13, "When we determine that a patient  after diagnosis, a patient needs to be admitted, we call the staff physician that has admitting privileges." And Page 62, Line 8 or 9, "Who made the diagnosis that she had these stones was Dr. Stokes."

In response to our motion for summary judgment, they have filed an additional affidavit of Dr. William Truly. Now, my copy of the affidavit is not signed by Dr. Truly. I don't know if the plaintiffs have a signed affidavit from Dr. Truly or not. But assuming that they do because I 
BY MR. SWEET:[3] Did you attach that deposition to your motion?
BY MR. HAGWOOD: Yes. I did.
BY MR. SWEET: I didn't see that.

*280 BY MR. HAGWOOD: Well, the 
BY MR. SWEET: Okay. That's fine.
BY MR. HAGWOOD: The affidavit of Dr. Truly states as follows  Dr. Truly says in Paragraph 6 of the affidavit  and I can  if the Court please, I've got a 
BY THE COURT: I think I have it right here.
BY MR. HAGWOOD: Okay. Paragraph 6, it says, "The emergency room physician who has specialized knowledge has a duty to hospital  has a duty to hospitalize Ms. Thomas." Paragraph 7, he says he has a duty to hospitalize her. Paragraph 8, has a duty to hospitalize her. Dr. Harper has no admitting privileges. That's uncontradicted. Dr. Truly can have all the opinions he wants to about breaches of the standard of care, but here we have an emergency room physician who went off duty, turned over the care to another emergency room physician who decided not to hospitalize her and send her home.
So all of the  all of the opinions of Dr. Truly are predicated upon that final discharge from the emergency department, and my doctor didn't have the results of the IVP, and he doesn't have the ability to hospitalize the patient under any circumstances. The  the way that emergency care functions in this country now and what the standard of care is is testified to by Dr. Harper: "As the emergency room physicians stabilize patients, and if they need to be admitted, they call the staff physician who then admits the patient to the floor."
So there is no genuine issue of material fact. This case comes down to what the IVP showed. It comes down to a need under the plaintiff's theory to have hospitalized her. Dr. Harper wasn't on duty when that  was not in the emergency department when the duty to hospitalize her arose. So we believe that we're entitled to summary judgment because all of the opinions of Dr. Truly are predicated upon her being admitted to the hospital, which we cannot do. We could not have done it anyway because we weren't even there  physically in the emergency room.
¶ 32. The quoted passage demonstrates that the pivotal issue in the court below was not the absence of Dr. Truly's sworn signature but the lack of admitting privileges for Dr. Harper and his absence from the hospital at the time that the results from the IVP became available, as well as at the time of Mrs. Thomas's discharge. Further, it seems to me that a reasonable assumption is that at the time of the summary judgment hearing Dr. Truly had given an affidavit, although the copy that the court and Dr. Harper's attorney were using may not have been signed. However, it appears clear that even if no affidavit existed at that time, because of the absence of Dr. Truly's sworn signature, Dr. Harper's attorney waived any objection to the court's consideration of Dr. Truly's unsigned statement when he went on to discuss the contents of the purported affidavit without reservations.
¶ 33. I now turn to the merits of the issue. Based on my review of the record, I am convinced that Thomas presented enough evidence in response to the motions for summary judgment to prevent the grant of summary judgment. I refer at length to Dr. Truly's proposed testimony as reflected in Thomas's expert designation:
Dr. Truly will opine that the nursing notes on the day of admission to the emergency room revealed that a Dr. Harper examined Ms. Thomas. The patient was taken to X-ray by wheelchair at 15:35 hours. A catheterized specimen was obtained at 15:47 hours. The patient *281 received Dulcolax suppository at 18:15 hours. As mentioned previously the patient was placed on Toradol and Phenergan. Ms. Thomas was discharged at about 18:00 hours or shortly thereafter. The nursing notes document that she was discharged in stable condition.
Dr. Truly will opine that Ms. Thomas' laboratory findings on 8/15/01 noted her white count to be 11.2, which was slightly high. Her neutrophils were noted to be 87.7, which is significantly elevated with normal being 50 to 70. Ms. Thomas had evidence of infection at the time that she was seen in the emergency room. She had a low-grade temperature that ranged from 99 to 101 to 100.5, significantly elevated neutrophils, a specific kind of white blood cells and a diagnosis of renal stones. These preliminary findings alone should have been sufficient for the patient to have been admitted or at least to have received a urological consultation. Additionally, Ms. Thomas' mean corpuscular volume was 71.2 with normal being 80-99. Ms. Thomas' mean corpuscular hemoglobin was 22.9 with normal being 27-31. Her mean corpuscular hemoglobin concentration was a bit low at 32.2 with 33 to 37 being normal. These indices and findings suggest a microcytic anemia in a patient with renal stones and associated infection. Ms. Thomas' amylase was noted to be negative.
Dr. Truly will opine that Ms. Thomas' urinalysis on 8/15/01 revealed that she had rare WBCs. She did have RBCs, 20-3, which means that at that particular time, she seemingly had what is known as a microscopic hematuria. There was an associated 4 + bacteriuria, which meant that Ms. Thomas also had associated urinary stones. The patient's urine culture came back, which was ordered on 8/15/01 showing that she had Escherichia coli, which was sensitive to a multitude of antibiotics including certriaxone, cefurozime, nitrofurantoin, tazobactam, tetracycline, Timentin, Bactrim, and levofloxacin. Ms. Thomas, while in the emergency room, received a flat plate of abdomen (flat and erect) and an intravenous pyelogram. Findings as interpreted by the radiologist revealed that she had a partial obstruction of her right ureter at the level of the upper part of the collecting systems. There were a few small calculi noted in the lower pole of the left kidney. There was a delay in excretion of contract material on the left side. As a matter of fact, the delay was about twenty minutes following the injection of the dye. There was a suspicious small calculus projecting over the left transverse process of the LA vertebra, which the radiologist read as calculus in the left ureter causing obstruction. The radiologist recommended retrograde pyelograms. This means that Ms. Thomas had stones in both of the collecting tubules that extend from the kidney into the bladder that actually serves as a roadway and/or passageway for urine to flow, being formed and made in the kidney and flows into the bladder. This passageway or corridor was blocked with stones, either totally on the left and/or partially on the right.
Dr. Truly will opine that the studies done on 8/15/01 were very interesting. The information was transcribed on 8/16/01, the following day, however, the emergency room physician could not have looked at the charts. Dr. Truly will testify that the doctor never looked at the flat plate and upright of the abdomen, nor did he ever view the intravenous pyelogram himself. Dr. Truly does not believe that the doctor ever viewed the urinalysis on the patient with microscopic *282 hematuria and red blood cells 20-30 with a 4 + bacteriuria nor does he believe that the doctor reviewed the patient's CBC. Dr. Truly will opine that the doctor must have been oblivious to Ms. Thomas' tachycardia and temperature of 99, 101 and 100.5 while she was in the emergency room. Even if the doctor had placed the patient under appropriate antibiotics for her urinary tract infection, he elected not to do anything about the stones in her ureters. At this time. Ms. Thomas should have been immediately referred to an urologist or at least an urologist should have been called in. The emergency room physician could have, at the very least, hospitalized this Medicaid patient. If Ms. Thomas had no physician she would have been limited to the physician responsible for unreferred calls. However, the patient was discharged home on pain medication only.
¶ 34. In Dr. Harper's deposition testimony that was made a part of Thomas's response in opposition to the motion for summary judgment, Dr. Harper gave the following testimony:
Q. Dr. Harper, are you familiar with the signs and symptoms of kidney stones?
A. Yes.
Q. Could you tell me what they are?
A. Back pain, side pain, pelvic pain. There can be nausea, vomiting. Actually people can have kidney stones and pass kidney stones and have little to no signs or symptoms. The signs and symptoms come from the obstruction of the ureter.
Q. Right.
A. Okay? And there you go.
Q. What about urination in the blood? I mean, I'm sorry, blood in the urine?
A. That's very common in kidney stones.
Q. And pain upon urination?
A. That  urinary symptoms of urgency, frequency, nocturia can all occur in a kidney stone.
Q. Nausea and vomiting?
A. They're not, they're not absolute though. Nausea, nausea is commonly present but it's not absolute.
Q. And you would agree with me that upon Ms. Thomas' presentation to the ER department she exhibited these signs and symptoms; is that correct?
BY MR. HAGWOOD: Object to the form of the question.
BY MS. CURRIE:[4] Object to the form.
A. She had some of them.
Q. She had some of them. Okay. Could you identify all of the signs and symptoms that she exhibited at the time  at the time you saw her?
BY MS. CURRIE: Signs and symptoms of?
BY MR. NELSON:[5] Kidney stones.
A. She had side pains, she had some urinary complaints, she had nausea and vomiting.
Q. And what do you mean by urinary complaints?
A. Well, she told the triage nurse about burning on urination.
Q. Okay. And did any of the lab reports suggest that she had an infection in her urinary tract?

*283 A. She had bacteria, she didn't have any pus in her urine, didn't have any white blood cells.
Q. She had bacteria?
A. Uh-hmmm.
Q. Okay. If the bacteria goes untreated for a urinary tract infection, it gets worse; is that correct?
A. You can get sicker.
¶ 35. In Dr. Truly's affidavit that was before the court, Dr. Truly stated:
1. My name is Dr. William Truly. I am a medical physician with extensive experience and expertise in hospital emergency room care.
2. I have conducted a review of the medical records from Greenwood Leflore Hospital Emergency Room regarding Mrs. Ada Mae Thomas.
3. Based on my review of the referenced material and my experience and training in the medical field, I am of the opinion that, within a reasonable degree of medical certainty, "Mrs. Ada Mae Thomas would have survived had the attending emergency room physician, Dr. William Harper, not breached the required standard of care by failing to render appropriate emergency medical care to her that a similarly situated emergency room physician would have rendered under the same or similar conditions.
4. When Mrs. Ada Mae Thomas presented herself to Greenwood Leflore Hospital emergency room, blood was detected in her urine. This is known as Hematuria. Hematuria, when found in a patient with moderate abdominal pain and a history of nausea and vomiting, should provoke compelling concern.
5. When patients with hematuria present with low-grade fever and elevated white counts and/or neutrophils, the physician should know that such data, without intervention, could have a dangerous outcome. This is particularly true in the case of Mrs. Thomas who presented with moderate abdominal pain, nausea, vomiting, fever, slightly elevated white count, glaring elevated neutrophils, blood in her urine, and radiographic diagnosis from an intravenous pyelogram demonstrating partial obstruction of the left ureter as well as the right ureter.
6. The emergency room physician, who has specialized knowledge, has a duty to hospitalize and treat patients such as Mrs. Thomas. The emergency room physician's failure to treat Mrs. Thomas constituted an act of negligence that was so serious to the extent that it was the proximate cause of death.
7. Mrs. Thomas presented herself to the emergency room of Greenwood Leflore Hospital on August 15, 2001, at 14:25 p.m. and was discharged at 18:50 p.m. Mrs. Thomas was under the care of Dr. Harper for at least 4½ hours. Even if Mrs. Thomas was under Dr. Harper's care for three hours, he still had sufficient medical facts and data before him to conclude that Mrs. Thomas would have a serious negative outcome without appropriate and immediate medical intervention including hospitalization.
8. All of the laboratory and diagnostic test results that would have provided Dr. Harper with sufficient facts and data to diagnose Mrs. Thomas' declining condition were available to him during his shift in the Greenwood Leflore Hospital Emergency Room. Dr. Harper had ample time to evaluate and manage Mrs. Thomas and to interpret and respond to the available medical data that he ordered while she was under his care.
9. The emergency room physician's failure to admit and treat Mrs. Thomas, who clearly indicated symptoms of a declining *284 health condition, was negligent and resulted in the untimely death of Mrs. Ada Mae Thomas.
AND FURTHER AFFIANT SAYETH NOT.
¶ 36. In my view, the trial court erred in granting summary judgment, and the majority errs in affirming the trial court's erroneous ruling. As stated, the trial judge granted summary judgment in part because Dr. Harper did not have admitting privileges at the hospital. However, it is clear from Dr. Harper's testimony that he had the ability to effectuate an admission if he deemed it necessary. Therefore, for the reasons stated, I dissent. I would send this case back to the trial court for a trial on the merits.
NOTES
[1] The majority finds that Thomas failed to present via affidavit the testimony of his expert, Dr. William Truly, who, according to Thomas, was "prepared to testify to the standard of care that should have been followed and that Dr. Harper breached the standard of care."
[2] The Honorable Carl Hagwood represented Dr. Harper at the trial court level and also represents him in this appeal.
[3] The Honorable Dennis Sweet represented Mr. Thomas at the trial court level and also represents him in this appeal.
[4] The Honorable Gaye Currie represented the Greenwood Leflore County Hospital at the trial court level and also represents it in this appeal.
[5] The Honorable Omar Nelson was one of the attorneys representing Mr. Thomas at the trial court level.