# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CT-01881-SCT

*REGINA POWELL AND THOMAS POWELL*

*v.*

*METHODIST HEALTH CARE-JACKSON HOSPITALS*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/2001 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LANCE L. STEVENS |
| | J. STEPHEN WRIGHT |
| ATTORNEYS FOR APPELLEE: | HEBER S. SIMMONS, III |
| | TINA LORRAINE NICHOLSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 07/01/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1. Regina Powell and her husband, Thomas, filed suit against Methodist Health Care-Jackson Hospitals (Methodist), alleging that Powell had suffered an injury to her leg and foot during surgery to remove her gall bladder. The Hinds County Circuit Court granted Methodist's motion for summary judgment. Powell appealed, and the appeal was assigned to the Mississippi Court of Appeals which unanimously affirmed. We subsequently granted certiorari.

¶2.     The Court of Appeals' opinion, ***Powell v. Methodist Health Care-Jackson Hosps.***, 856 So. 2d 353, 355-56 (Miss. Ct. App. 2003), adequately sets out the facts in this case. Therefore, they will not be repeated here.

## ANALYSIS

¶3.     Because we conclude that summary judgment was appropriate and the Mississippi Court of Appeals did not err, we affirm the judgment in this case.

¶4.     As the Court of Appeals correctly noted, where the matter at issue is not within the scope of a layperson's common knowledge, negligence can be proven in a medical malpractice action only where the plaintiff presents medical testimony establishing that the defendant physician failed to use ordinary skill and care. ***Gatlin v. Methodist Med. Ctr., Inc.***, 772 So.2d 1023, 1026 (Miss. 2000). *See also **Coleman v. Rice***, 706 So.2d 696, 698 (Miss. 1997);***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So.2d 1346, 1354 (Miss. 1990). Moreover, as in any negligence action, a plaintiff claiming medical malpractice must show that there is a causal connection between the injury and the defendant's conduct or acts. *See **Palmer***, 564 So. 2d at 1355.

¶5.     Here, Powell presented medical testimony through her expert, Dr. Alexander. ***Powell***, 856 So. 2d at 357. Dr. Alexander plainly stated that the operating table strap *probably did not* cause Powell's injury. ***Id.*** As the Court of Appeals concluded, Dr. Alexander's testimony made no mention of any deviation from Methodist's standard of care. ***Id.*** As such, it escapes us how we could conclude that Powell established Methodist's standard of care in this case.

¶6.     Moreover, we agree with the Court of Appeals that Powell also failed to make a showing of proximate cause. That is, Powell failed to show a causal connection between her injuries and Methodist's acts or conduct. Powell's other expert witness testified in her deposition that the operating table strap

2

appeared to be placed on Powell's leg in a "perfectly normal" manner. **Powell**, 856 So. 2d at 357.

Powell alleged that "either medical negligence or some sort of pressure was inflicted on her left leg." **Id.**

at 356. However, the same expert stated that according to the medical records, there was no evidence

of external pressure to Powell's leg during the procedure. **Id.** at 357.

¶7.     Finally, as to Powell's assertions regarding res ipsa loquitur, we conclude that doctrine is

inapplicable under the facts presented here. Under the doctrine of res ipsa loquitur, negligence can be

inferred in certain factual situations. **Winters v. Wright**, 869 So.2d 357, 363 (Miss. 2003). This Court

has held that this doctrine should be cautiously applied. **Id.** Explaining the use of this doctrine, we have

stated that

> [t]he real question, generally, is whether or not in the process of the operation any
> extraordinary incident or unusual event, outside of the routine of the action of its
> performance, occurred, and beyond the regular scope of its customary professional activity
> in such operations, which, if unexplained, would themselves reasonably speak to the
> average man as the negligent cause or causes of the untoward consequence.

**Id.** Res ipsa loquitur may be applied only when three elements[1] are present. First, the defendant must have

control and management of the instrumentality causing the plaintiff's injury. **Id.** Moreover, "the injury must

be such that in the ordinary course of things it would not occur if those in control of the instrumentality used

proper care." **Id.** Third and finally, res ipsa loquitur only applies where the injury is not a result of the

plaintiff's voluntary act. **Id.**

---

[1]We note that the Court of Appeals, citing **Brown v. Baptist Mem'l Hosp.-DeSoto,Inc**., 806 So. 2d 1131,1135 (Miss. 2002), concluded that four elements must be satisfied in order for this doctrine to be applicable. It is true that **Brown** states this proposition, but that language is a mere aberration. We clarified in **Winters** that the doctrine is made up of *three* elements. We reiterate that holding today.

¶8. Powell's own expert witness confirmed that the cause of Powell's injury could be from negligent or non-negligent causes. Specifically, Dr. Alexander stated, "I would have to speculate as to the possible cause, and only after said speculation could I label it negligent or not. I could not tell you now that I am certain negligence occurred in the operating room this day." *Id.* at 359. Additionally, there was no evidence that the result of the injury was not a result of some voluntary act on Powell's part. Therefore, we hold that the doctrine of res ipsa loquitur does not apply in this case.

## CONCLUSION

¶9. In sum, Powell failed to establish Methodist's standard of care; she made no showing of a causal connection between her injuries and Methodist's acts or conduct, and; she did not satisfy the elements of res ipsa loquitur in this case. Accordingly, under our case law, we hold that the Court of Appeals and the trial court did not err and that Methodist Health Care - Jackson Hospitals was entitled to summary judgment. Therefore, we affirm the judgments of the Court of Appeals and the trial court.

¶10. **AFFIRMED.**

**WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**EASLEY, JUSTICE, DISSENTING:**

¶11. I respectfully dissent from the majority opinion today. The Court of Appeals did not cite *Palmer v. Clarksdale Hosp.*, 206 Miss. 680, 40 So.2d 582 (1949) in its opinion. I conclude that pursuant to this Court's holding in *Palmer*, the element of instrumentality could be met at trial. Therefore, I would reverse and remand the case for further proceedings.

## I. Instrumentality

¶12.     The Powells cite *Palmer v. Clarksdale Hospital*, 206 Miss. 680, 40 So.2d 582 (1949), where Palmer suffered injuries to her feet during a non-specified surgery, allegedly due to improper use of straps used to fasten Palmer's feet to the operating table.  The trial court granted a directed verdict in favor of Clarksdale Hospital at trial.  Palmer called as a witness Miss Francis, who was the circulating nurse during the surgery.  Francis had no independent recollection of the surgery.  She did agree that she did not loosen the straps during the forty-five minutes they were on Palmer's feet, but she did not believe that the straps were capable of being tightened enough to cut off the circulation to the feet.  This Court reversed, stating:

> There was no defect in appellant's feet when she went into the operating room. She was there placed under an anaesthetic and rendered unconscious, so that she was unable to take care of herself or make complaint of anything that was done to her. The straps were placed upon her feet and were kept there, suspending the weight of her feet and legs, without release or loosening to restore circulation, for about forty-five minutes. Nothing touched appellant's feet that could have caused this injury except these straps. **The demonstration made before the jury, coupled with the testimony of appellant's physician, was such that the jury could have found, as reasonable men, that the straps continued to tighten upon appellant's feet to the extent of obstructing the circulation of blood therein, and that reasonable care on the part of appellees required a temporary loosening of these straps, and that a failure therein proximately caused the injuries to appellant.** In fact, the evidence excluded every causal connection except the straps, and we are of the opinion that the lower court erred in excluding the evidence and refusing to submit the case to the jury for decision.

*Palmer*, 206 Miss. at 693-94, 40 So.2d at 584 (emphasis added).

¶13.     This Court in *Palmer v. Clarksdale Hospital* relied on *Ybarra v. Spangard*, 154 P.2d 687 (Cal. 1944), where Ybarra had his appendix removed.  Ybarra remembered that when he was placed on the operating table two hard objects were pressing into his neck and shoulder area.  After surgery Ybarra felt pain and numbness in his right shoulder.  The trial court dismissed Ybarra's suit.  The California Supreme Court reversed, finding that the fact that Ybarra could not identify any definite instrumentality as

5

causing his injury was not fatal to his cause of action. It further found that a strict interpretation of res ipsa loquitor would result in few if any patients able to recover for injuries received while unconscious. The court finally held that "where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." *Ybarra*, 154 P.2d at 691.

¶14.    Here, the Court of Appeals found that there was no showing of an instrumentality under the exclusive control of Methodist Hospital that caused damage to Powell. The operating room circulating nurse in Powell's gall bladder surgery was Carolyn Rowe, but there is no deposition testimony or account from her concerning the surgery in this record. There is an excerpt from the deposition of Barbara Bregande, identified as the Powells' nursing expert, in Powell's petition for certiorari. In her deposition, she testified:

> Q:    Do you have any information or knowledge that they [operating room staff] weren't careful in placing that strap?
> A.    I have no way of knowing that, because I see nothing in the records to indicate how the strap was placed or the second time the strap was placed on the patient. *I only know how is was placed the first time which looked perfectly normal.*
> Q.    And do you have any information or information that there was any external pressure placed on Mrs. Powell leg during the course of that procedure?
> A.    I cannot find in the records any other area where we might conceive that the patient had pressure other than in the operating room.
> Q.    That is not my question. My question was, do you have any information or knowledge that there was external pressure placed on her leg during the course of that procedure?
> A.    According to the record, no.

(emphasis added). However, there was some mention of a body strap by Powell's experts, but there is no deposition testimony on how the strap was applied. Powell testified that she was unconscious and did not

6

recall anything from the point that the anesthesiologist gave her a sedative. She testified in her deposition

as follows:

Q.     When they took you to surgery, then what happened? What do you recall?

A.     I recall going to another area where a anesthesiologist came in and asked some questions....

Q.     Let me back up a second. Before you went in to speak with the anesthesiologist, had you been given any medication --

A.     I don't recall....

Q.     Okay. At the next stage, were you given any medication by the anesthesiologist at that point?

A.     I think I was given a -- after I talked to the anesthesiologist, on of those -- I guess, like a sedative shot to relax me.

Q.     Okay. How did that affect you?

A.     I don't remember anything past that point.

Q.     Were you conscious?

A.     Not after the sedative.

Q.     Okay. Prior to receiving the sedative, what else do you remember as far as preparations for surgery?

A.     That's about all I remember....

Q.     Prior to be given the sedative, do you recall bumping your left knee on any piece of hospital equipment?

A.     No.

Q.     You were just positioned in the bed -- how were you positioned in the bed? Were you laying on your back?

A.     Yes.

Q.     Legs straight out in front?

A.     On my back, elevated a little bit. Kind of a sitting position.

Q.     How were your legs positioned?

A.     Straight....

Q.     Do you recall being uncomfortable at all in the way you were positioned prior to going into the operating room --

A.     No.

Q.     -- at any point? Prior to being given the sedative, do you recall a safety strap across you at any location on your body?

A.     Prior to the sedative?

Q.     Yeah.

A.     No.

Q.     Okay. Do you recall seeing any kind of safety strap laying across your body at any point prior to or after the surgery?

A.     No.

> Q. Do you know what type of anesthetic you were given? Were you given a general anesthesia or a local? I understand you had gallbladder surgery.
> A. Yes.
> Q. Did they knock you out completely?
> A. Yes
> Q. When you transferred yourself from the stretcher to the bed, were you able to pick your legs up and move them over yourself?
> A. Yes.
> Q. So you could pick them up and put them down?
> A. Yes.
> Q. Okay. Did you tell me you recalled feeling the sensation of your left foot being asleep as soon as you woke up?
> A. As soon as I woke up.
> Q. Did you report that to anybody?
> A. Everyone in the room.
> Q. Who do you recall being in the room?
> A. There were two staff personnel that brought me to the room. I think it was two males. There was a nurse already in the room. I'm assuming that was my assigned nurse. My husband and my mother-in-law.

¶15. Dr. Fisher, the doctor who performed the gallbladder surgery, testified in his deposition that straps are always used on patients in surgery but did not recall specifically if straps were used on Powell. He stated:

> Q. Do you recall a safety strap being used on Mrs. Powell?
> A. I don't recall in particular for Mrs. Powell, but I will tell you the safety strap is always used on patients -- so that number one, they don't fall off the table.
> Q. Certainly.
> A. They fall off the table and bust their head open and all like that, then we got a real problem.
> Q. Yes, sir. So you don't recall specifically a safety strap on Mrs. Powell; is that right?
> A. I wasn't -- probably wasn't there when she was being place on the table and everything being put on the table, so I can't tell you one way or the other.

¶16. Dr. Alexander, the neurosurgeon who treated Powell for compressed nerve damage testified that he could state what cause Powell's nerve compression. However, he stated in his deposition as follows:

> Q. I hearing you to say that you're not prepared to testify to a reasonable degree of medical probability as to what caused her compression?

8

A. I am prepared to give the opinion that I think it was a compression. I do not know what the compressive agent would be or could be not, A, having been there and, B, being ultimately familiar beyond a -- just a rudimentary level as to what could have caused the compression. I know there is a black strap used, but I think the people that were there on that case that day might better give opinions.

Q. I just want to make sure I understand so I don't waste all of our -- everybody's time. With regard to the causation, at this point, you're limiting your testimony to the fact that she had a compressed peroneal nerve, but as to what caused, to a reasonable degree of medical probability, that compressed nerve, that's not what you're prepared to testify to, correct?

A. That's been my opinion all along.

He further testified:

Q. Now, I apologize for asking you this again, but we're on the subject: Based on everything that we've talked about, and based on your knowledge, education, training and experience, I believe you've testified that you can't say to a reasonable degree of medical probability what the compressive agent was; is that correct?

A. Yes, sir, I think we've hit it three or four different times. I cannot say.

Q. Okay.

A. All I can say is that Mrs. Powell told me she went into the operating room without this complaint and she came out with it.

¶17. Based on this Court's holding in *Palmer* and this evidence, the element of instrumentality could be met at trial. Therefore, I would reverse the judgements of the Court of Appeals and the trial court and remand this case for trial.