# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00447-SCT

*JULIA CAVALIER, INDIVIDUALLY AND AS A
HEIR AT LAW OF LAUTAIN M. SCRUGGS,
DECEASED, JANNETTE SCRUGGS McDONALD,
INDIVIDUALLY AND AS A HEIR AT LAW OF
LAUTAIN M. SCRUGGS, DECEASED, AND THE
ESTATE OF WILMA LAUTAIN SCRUGGS,
DECEASED*

*v.*

*MEMORIAL HOSPITAL AT GULFPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2017 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| TRIAL COURT ATTORNEYS: | DAVID N. HARRIS, JR. |
| | KAARA L. LIND |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID N. HARRIS, JR. |
| | CHRISTOPHER C. VAN CLEAVE |
| | CLYDE H. GUNN, III |
| ATTORNEYS FOR APPELLEE: | WILLIAM E. WHITFIELD, III |
| | KAARA L. LIND |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 09/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND MAXWELL, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     While recovering from surgery at Memorial Hospital at Gulfport, eighty-nine-year-old

Lautain Scruggs fell after getting out of her hospital bed.  Scruggs suffered a head injury

(subdural hematoma) that required almost immediate surgery.  Testimony at trial established

that the previously independent Scruggs never recovered fully from the head injury sustained when she fell. Several years later, Scruggs died; her death was unrelated to the head injury.

¶2. Scruggs's daughters Julia Cavalier and Jannette Scruggs McDonald and her estate (collectively Cavalier) filed a complaint against Memorial Hospital for medical negligence.[1] Pursuant to the Mississippi Tort Claims Act, the trial court conducted a multiday bench trial, with the evidence essentially being a battle of the experts on the appropriate standard of care as it related to Memorial Hospital's fall-risk assessment tool. Ultimately, the trial court found in favor of Memorial Hospital, and Cavalier filed a motion for a new trial. The trial court denied Cavalier's motion for a new trial, so Cavalier filed the present appeal. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. On July 8, 2013, surgeons at Memorial Hospital performed a hemicolectomy on eighty-nine-year-old Scruggs. Following her surgery and a short time in recovery, Scruggs arrived on Floor 5A of the hospital, where Nurse Cammie Cothern initially assessed Scruggs. Nurse Cothern did not indicate Scruggs was a fall risk or initiate Memorial Hospital's "Spot the Dot" program; however, she did employ several measures used to reduce or prevent falls. Nurse Cothern charted that Scruggs was awake, alert, aware, cooperative, and oriented, with clear speech. Later in the day, Nurse Cothern provided Scruggs with an educational sheet regarding how to prevent falls, and Scruggs indicated that she read and understood the

---

[1] The initial complaint was filed prior to Scruggs's death, so only Scruggs was listed as the plaintiff; however, following Scruggs's death, an amended complaint was filed. The amended complaint removed Scruggs from the complaint and substituted her daughters and her estate as plaintiffs.

information. Scruggs's family was present when Nurse Cothern provided and explained the educational sheet. Nurse Cothern charted that Scruggs's bed was in a low position with the upper side rails raised, that her items were within her reach, and that Scruggs had been instructed to use her call button for assistance.[2] Scruggs received pain medication (Toradol and Demerol) at 5:15 p.m. on the same day, which was the last dose of pain medication before she fell the following night.

¶4.     At 7:20 a.m. on July 9, 2013, Nurse Amy Wade attended to Scruggs.  Nurse Wade charted Scruggs as a fall risk, so she initiated the "Spot the Dot" program.  The program is a fall-prevention measure used to communicate risks, usually in the form of a yellow arm band for the patient and a yellow dot on the patient's door and in her chart.  Nurse Wade continued the safety measures implemented by Nurse Cothern as noted above.  Similarly, Nurse Wade charted that Scruggs was awake, alert, aware, and suffering from no apparent cognitive difficulties.  Scruggs's friend Betty Ladner, who visited Scruggs on the morning of July 9, 2013, testified that Scruggs was sitting in a chair, applying make up, and that she was fully alert and conversing as usual.

¶5.     By mid-morning on July 9, 2013, Scruggs's catheter had been removed and she was encouraged to walk with assistance of a walker.  Scruggs also saw an occupational therapist, who charted that her ability to walk was similar to her pre-operative abilities and that she was

---

[2] The chart also indicated that Scruggs had been directed to use no-slip socks or footwear, but there is no indication in the record that any were provided or used by Scruggs.

almost baseline with her functional status. The occupational therapist did not note any cognitive issues but did note that Scruggs understood complex commands.

¶6. Amanda Clark, Scruggs's nurse for the night of July 9, 2013, assessed Scruggs and determined that Scruggs was a fall risk. She implemented the "Spot the Dot" program and employed the same safety and fall-prevention measures that had been implemented by Nurse Wade. Nurse Clark charted that Scruggs was awake, alert, and aware. Additionally, Scruggs had clear speech, was oriented, was calm, and obeyed commands. Nurse Clark testified that, "if [Scruggs] had been confused or shown [] any signs of noncompliance . . . I would have put a bed alarm on her." Scruggs's chart indicates that, at 8:20 p.m., she was resting comfortably in a chair, and that at 9:33 p.m., she was back in her hospital bed visiting with her daughters. Twenty minutes later, she was back in her chair. Scruggs was back in her bed and sleeping at 10:15 p.m.; however, at approximately 10:50 p.m., a nursing assistant entered Scruggs's room and found her on the floor propped up on a trash can. There was blood on the floor, on Scruggs's cheek, and in her hair. Scruggs informed the nursing assistant that she had gotten up to use the restroom without calling for assistance because she did not want to bother anyone. According to Nurse Clark, Scruggs's neurological function appeared intact, and Scruggs did not indicate she had any pain from her fall.

¶7. However, in the early morning hours of July 10, 2013, Scruggs lost consciousness and Dr. Eric Wolfson, a neurosurgeon who is not a party to the instant case, examined Scruggs and determined she had a "right parietal scalp abrasion and contusions and other neurological findings." At 4:00 a.m. on the same day, Dr. Wolfson performed "an emergency right frontal

4

craniotomy and evacuation of subdural hematoma" on Scruggs. The parties stipulated that the hematoma requiring Dr. Wolfson's care "was caused by the fall [] Scruggs sustained on July 9, 2013, while she was a patient at Memorial Hospital at Gulfport."

¶8. Scruggs was discharged from Memorial Hospital on August 22, 2013, and she was transferred to Lakeview Rehabilitation Center for a few months. Scruggs then moved to her daughter Jannette McDonald's home in Georgia, where McDonald had renovated parts of her home and had purchased medical equipment to accommodate her mother. Scruggs remained in McDonald's home and required twenty-four hour care until her death on April 1, 2015.

¶9. In its judgment, the trial court found in favor of Memorial Hospital. The judgment explained that "Memorial[ Hospital]'s fall risk assessment tool does not provide for a finding of stratified risk assessment of a patient. It only assesses whether or not the patient is at risk for falling." If the patient is deemed to be a fall risk, then the attending nurse determines the appropriate prevention measures. Finally, once a patient has been classified as a fall risk, each subsequent nurse is required to reassess the patient's condition to determine if any future modifications should be made.

¶10. According to the trial court's conclusions of law, Cavalier failed to establish a prima facie case of medical negligence because Cavalier did not prove that Memorial Hospital had breached the standard of care, that Scruggs's injuries had been foreseeable, or that the absence of a bed alarm had been a proximate cause of Scruggs's injuries. After the trial court

5

denied a motion for a new trial, Cavalier filed the present appeal. On appeal, Cavalier raises the following four issues for review:

I. Whether the trial court abused its discretion ruling that the national standard of medical care does not apply to any hospital in Mississippi; and that hospitals can utilize the "local or regional standard of care.

II. Whether the trial court's finding that Scruggs was cognitively intact prior to her fall are manifestly erroneous and against the overwhelming weight of the evidence.

III. The trial court abused its discretion and committed manifest error finding that the fall and injuries suffered by Scruggs were not foreseeable.

IV. The trial court abused its discretion and committed manifest error finding Memorial [Hospital']s failures to comply with the standard of care did not cause Scruggs's injuries.

After careful review of the issues raised, we hold that the causation issue is dispositive and will not address the remaining three.

**STANDARD OF REVIEW**

¶11. While questions of law are reviewed de novo, the Court reviews a circuit court judge's factual findings made following a bench trial with the same deference given to a chancellor's factual findings. That is, the circuit court's factual findings will not be disturbed if supported by "substantial, credible and reasonable evidence." ***Miss. Dep't. of Mental Health v. Hall*** 936 So. 2d 917, 922 (¶ 6) (Miss. 2006) (quoting ***City of Jackson v. Internal Engine Parts Group, Inc.***, 903 So. 2d 60, 63 (¶7) (Miss. 2005)).

**ANALYSIS**

¶12. In order to prevail in a medical negligence action, the plaintiff must show the existence of a duty, the applicable standard of care, the failure to perform to that standard, the breach of that duty as a proximate cause of the injury, and the resulting damages due to the breach. *Estate of Northrop v. Hutto*, 9 So. 3d 381, 384 (¶9) (Miss. 2009).

¶13. At trial, Cavalier provided the expert testimony of Dr. Maria Cvach, who is the director of policy management and integration at Johns Hopkins Health System. Additionally, she is a co-author of Johns Hopkins Fall Risk Assessment tool. According to Dr. Cvach's testimony, to a reasonable degree of nursing probability, Memorial Hospital breached the standard of care with regard to fall-risk assessments, fall-risk injury assessments, and implementation of fall-prevention measures as they relate to Memorial Hospital's treatment of Scruggs. Dr. Cvach also testified that, to a reasonable degree of nursing probability, Scruggs's fall was caused by a breach of the standard of care. When asked "what is the national standard of care for the[] assessment for falls and the implementation of . . . fall prevention measures[,]" Dr. Cvach's answer was as follows:

> The standard is to use a reliable tool to objectively assess the patient as to whether they are likely to have an anticipated fall. And then to look at their injury risk because not every patient is equal when they fall. . . . And then based on those two measures, to institute a care plan that would be appropriate for preventing a fall.

Dr. Cvach identified two areas in which Memorial Hospital's nurses had failed to meet the standard of care: 1. failure to use a bed alarm; 2. failure to make hourly comfort rounds.

¶14. Memorial Hospital presented the testimony of its expert witness Gayle Elliott. Elliott testified that Memorial Hospital and its employees met the appropriate standard of care

relative to the assessment and care of Scruggs prior to her fall. On cross-examination, Cavalier questioned Elliot about whether the standard of care requires a hospital "to have a fall risk assessment tool in place that differentiates between the fall risk of a patient between a low risk and a high risk fall patient[,]" and her response was that the hospital's tool is "required to differentiate risks. It's not necessarily required to stratify the degree of risk. In other words, it should have, at a minimum, which Memorial's tool did, [whether their patients are] either not at risk or they are. Whether or not they choose to further stratify that risk depends upon the facility."

¶15. The trial court found that Cavalier failed to prove that the absence of the bed alarm was the proximate cause of Scruggs's fall and subsequent injuries. The trial court based its position on the uncertain testimony surrounding the effectiveness of bed alarms to prevent falls. The testimony from the two experts regarding the use and efficacy of bed alarms was contradictory and generally inconclusive. During the cross-examination of Cavalier's expert, Dr. Cvach, the following exchange occurred:

> Q.     So you've got zero information that would allow you to suggest that a bed alarm would have made any difference at all in this particular case?
>
> A.     I don't know if it would have or wouldn't have. But it would have been -- it wouldn't have hurt in any way to have a bed alarm on her. And, if anything, it might have helped.
>
> Q.     Might. You can't say to a reasonable degree of medical probability that it would have helped because you don't have the data?
>
> A.     Well, I would argue that there's no way to research that because when they do research studies on that, they don't know how many times they prevented a fall from a fall alarm because you can't research it. It's impossible to know.

Additionally, the trial court explained that it "cannot find by a preponderance of the evidence that more frequent comfort rounds would have prevented the fall." Memorial Hospital's expert opined that a bed alarm was unnecessary based on Scruggs's situation; more specifically, that nothing in Scruggs's charting led her to believe a bed alarm would have made a difference.

¶16. On appeal, Cavalier contends that the trial court abused its discretion and committed manifest error in holding that she failed to establish the causation element of her negligence claim. Cavalier points to the bed-alarm testimony by Dr. Cvach, the lack of frequent comfort rounds, and that Memorial Hospital took no further steps to protect Scruggs when she was identified as a fall risk.

¶17. "Proximate causation is an essential ingredient of a claim of medical negligence." *Erby v. N. Miss. Med. Ctr.*, 654 So. 2d 495, 499 (Miss. 1995) (citing *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990)). A causal connection must be shown between the injuries sustained and the hospital's conduct or actions. *See Powell v. Methodist Health Care-Jackson Hosp.*, 876 So. 2d 347, 348 (¶¶4-6) (Miss. 2004). While it is undisputed that Scruggs's injuries were a result of her falling, as has been explained, the bed-alarm evidence is too tenuous to support a finding that failing to use a bed alarm was the proximate cause of Scruggs's fall. Likewise, the testimony, which was even more scant, that an increase of comfort rounds would have prevented Scruggs's fall and injuries was insufficient to establish causation. Therefore, we hold that the trial court did not abuse its discretion in finding that Cavalier failed to establish the causation element of her claim.

9

## CONCLUSION

¶18. Because Cavalier failed to establish the causation element of her medical negligence claim, we affirm the judgment of the trial court.

¶19. **AFFIRMED**.

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL, BEAM, CHAMBERLAIN AND ISHEE, JJ., CONCUR.**