# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01036-COA

| | |
|---|---|
| **SOUTH CENTRAL REGIONAL MEDICAL CENTER** | **APPELLANT/ CROSS-APPELLEE** |
| **v.** | |
| **JOYCE B. REGAN** | **APPELLEE/ CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 05/04/2018 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | RICHARD O. BURSON |
| | PEELER GRAYSON LACEY JR. |
| | BENJAMIN BLUE MORGAN |
| ATTORNEYS FOR APPELLEE: | WILLIAM T. MAY |
| | CARROLL H. INGRAM |
| | JENNIFER INGRAM JOHNSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 09/08/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     On December 23, 2013, Joyce Regan filed a complaint against South Central Regional Medical Center (South Central), David Sullivan, M.D., Ronald Gatewood, M.D., Michael LaRochelle, D.O., Danielle Blakeney, M.D., and John and Jane Does 1-10.   Joyce's complaint alleged medical negligence and punitive damages based on alleged gross negligence and reckless conduct arising out of the care and treatment she received after an allergic reaction to iodinated radiocontrast dye (contrast dye) during a CT angiogram (CTA)

procedure. That allergic reaction ultimately led to a right-side craniotomy and many weeks in the ICU. All of the doctors listed in the complaint were dismissed prior to trial, leaving South Central as the only remaining defendant. After a four-day bench trial that began on May 22, 2017, the trial court entered its findings of fact and judgment on May 4, 2018. The trial court rendered a verdict for Joyce, which included a monetary judgment in the amount of $133,839.42. Aggrieved by the trial court's decision, South Central appealed. Aggrieved only by the amount of the trial court's monetary judgment and a denial of her motion for additur, Joyce filed a cross-appeal. Finding no error, we affirm the trial court's judgment.

### FACTS AND PROCEDURAL HISTORY

¶2. On August 14, 2012, Joyce was admitted to South Central's Radiology Department for an outpatient CTA scan of her neck with contrast dye. Joyce's cardiologist, Dr. David Sullivan, ordered the CTA scan as a result of recent cardiac symptoms Joyce had experienced. Knowing that Joyce had an allergy to contrast dye, Dr. Sullivan ordered that she pre-medicate the night before and on the morning of the scan with Pepcid, Prednisone, and Benadryl. On the morning of the exam, the CT technician, Sara Plunk, confirmed that Joyce had complied with Dr. Sullivan's pre-medication orders before the scan began. At the time of the scan, Joyce was 78 years old, weighed one hundred pounds, and was taking blood thinners. The scan began at 9:45 a.m. and ended at 10:08 a.m. Immediately following the completion of the scan, Joyce began experiencing an allergic reaction to the contrast dye, which presented itself in the form of involuntary movements of her body. Her allergic reaction was described as rigors, shivering, shaking, jerking, and uncontrolled movements

of the head, arms, and body. In response to Joyce's allergic reaction in the radiology department, she was moved onto a gurney to prevent her from falling. She was subsequently given a pillow and covered with a blanket, and the bed-rails of the gurney were secured in their upright position to prevent her from falling off. Dr. Steven Quin, the radiologist who performed the scan, was called at the onset of Joyce's allergic reaction, and he ordered at least two doses of Demerol to be administered to Joyce.[1] Dr. Quin's radiology nurse, Jennifer Norman, administered both doses of Demerol pursuant to Dr. Quin's orders. Dr. Quin testified that he personally saw and evaluated Joyce on at least two occasions while she was in the radiology department. Plunk made a notation in Joyce's chart that said, "NEVER GIVE CONTRAST AGAIN." According to Joyce's medical chart, the last dosage of Demerol was administered at 10:40 a.m. Throughout the time Joyce remained in the radiology department, hospital staff made three phone calls to her son, Ken Regan, to update him on Joyce's condition. The Demerol did not help alleviate Joyce's symptoms, and she continued to shake uncontrollably. Dr. Sullivan was contacted, and the decision was made to transfer Joyce to the emergency department for further treatment. With the decision being made to transfer Joyce to the emergency department, Ken came to the hospital to stay with her. Joyce testified that she remembered striking her head directly on the gurney multiple times; as a result, she had a terrible headache, and her ear hurt on the side of impact. Joyce also testified that she did not remember certain things immediately following the onset of an allergic reaction and that her "vision was not good." However, she testified that she did

---

[1] Joyce's medical chart is unclear as to the timing and specific care that she received on August 14, 2012. The lack of documentation in Joyce's chart is an issue on appeal.

notice "people kindly moving around like they were watching [her]." Joyce was transferred out of the radiology department at 11:20 a.m. but was not triaged or accepted into the emergency department until 11:55 a.m. Joyce's whereabouts or medical treatment is undocumented from 11:20 a.m. until 11:55 a.m. After entering the emergency department, a registered nurse named Markus Craig and the emergency-department physician, Dr. Danielle Blakeney, evaluated Joyce. Ken testified that when he arrived at the emergency department, his mother was lying unattended on a gurney. He testified that her head was "flopping on a pillow back and forth with arms flailing." He described her as a "fish out of water." Ken did not see any restraint mechanisms or any pillows or padding between Joyce and the bed-rail of the gurney. While in the emergency department, Joyce was given a small dose of Ativan, which finally resolved her symptoms, and she fell asleep shortly thereafter. Joyce shook continuously for a total of two hours and twelve minutes before the Ativan relieved her symptoms. Joyce was discharged from the emergency department at 4:47 p.m. It is disputed as to whether Joyce was given the option to remain in the hospital for further observation.

¶3. On the following morning, August 15, 2012, Joyce's family took her to Forrest General Hospital (Forrest General) in Hattiesburg due to continued headaches, slurred speech, and resumed shaking. A CT scan on that day revealed a subacute right-side subdural hematoma. Dr. David Yeh, the on-call neurosurgeon, recommended that Joyce be admitted into the intensive care unit for monitoring. Because all the beds at Forrest General were full, Joyce was transferred by ambulance to the University of Mississippi Medical Center

4

(UMMC). While at UMMC, doctors monitored Joyce for the next five days, and additional tests were performed. It was ultimately determined that the subdural hematoma was stable, and she was released on August 20, 2012. Joyce testified that upon discharge, she was advised that if she had any other symptoms or if her head began to hurt again, she needed to return to the emergency room.

¶4. After being at home for ten days, Joyce returned to the Forrest General emergency room on September 1, 2012. She complained of headaches, head pressure, and slurred speech. Dr. Yeh was on call when she arrived at the hospital, and after he reviewed a new CT scan, he found that the hematoma had grown and that Joyce needed immediate surgery. Joyce underwent a right-side craniotomy that same day. Joyce required close monitoring in the ICU and remained hospitalized until September 14, 2012. She was discharged to a rehabilitation floor at Forrest General. She remained on the rehabilitation floor until she returned home on October 1, 2012. Joyce incurred medical bills in the amount of $103,839.42 related to the care and treatment of her subdural hematoma at Forrest General and UMMC.

¶5. Dr. Yeh testified that after Joyce returned home, it took her a full year to recover from her brain surgery. Joyce's family testified that she is no longer able to engage in some of the activities that she previously enjoyed before her surgery, such as yard work and pool maintenance. Further, they testified that the frequency of her activities with her grandchildren and church have diminished greatly. Finally, Joyce alleges that as a result of the surgery, she has scar tissue in her head, which she describes as "knots." She alleges that

the "knots" cause discomfort when she sleeps and that they prevent her from sleeping on her right side due to sharp pains.

¶6.    On December 23, 2013, Joyce filed her complaint against South Central, David Sullivan, M.D., Ronald Gatewood, M.D., Michael LaRochelle, D.O., Danielle Blakeney, M.D., and John and Jane Does 1-10. She alleged medical negligence and sought punitive damages arising out of the alleged gross negligence and reckless conduct of the defendants. More specifically, Joyce alleged that all the defendants failed to protect her in both the radiology and emergency departments while she was on the gurney and experiencing an allergic reaction. Dr. Gatewood was dismissed as a party on March 18, 2016. Dr. LaRochelle and Dr. Blakeney were dismissed as a party on April 20, 2016. Finally, Dr. Sullivan was dismissed as a party on May 17, 2017, leaving South Central as the only remaining defendant. After discovery was concluded, South Central filed a motion to exclude expert opinion testimony from plaintiff's causation expert, David J. Yeh, M.D., and a motion to exclude expert opinion testimony from Joyce's liability expert, Ka Russum, RN, on April 24, 2017. South Central also filed a motion for summary judgment on April 25, 2017. The trial court denied all pre-trial motions by separate orders dated May 22, 2017. A four-day bench trial began on May 22, 2017. On May 4, 2018, the trial court issued its findings of facts and judgment with a verdict in favor of Joyce in the amount of $133,839.42. Both parties subsequently filed post-trial motions. On May 14, 2018, Joyce filed a motion for additur or, in the alternative, amendment of the court's findings and judgment or, in the alternative, a new trial on damages only. Also on May 14, 2018, South Central filed a motion

for reconsideration and amendment of the court's findings of fact and conclusions of law. The trial court denied both motions by separate orders entered on June 27, 2018. Both parties appealed.

## STANDARD OF REVIEW

¶7.     "In reviewing the decision of a trial judge sitting without a jury, this Court may only reverse when the findings of the trial judge are manifestly wrong or clearly erroneous." *Greenwood Leflore Hosp. v. Bennett*, 276 So. 3d 1174, 1178 (¶10) (Miss. Ct. App. 2018) (quoting *Sacks v. Necaise*, 991 So. 2d 615, 619 (¶6) (Miss. Ct. App. 2007)).  This Court reviews errors of law de novo.  *Id.* (citing *City of Jackson v. Perry*, 764 So. 2d 373, 376 (¶9) (Miss. 2000)).

## ANALYSIS

*South Central's Appeal*

¶8.     South Central alleges that the trial court's verdict was not based on sufficient evidence but that it relied on impermissible speculation.  More specifically, it alleges that Joyce's causation expert, Dr. Yeh, failed to link Joyce's subdural hematoma to any alleged breach of duty by the hospital.  South Central asserts that there was no expert testimony presented at trial to substantiate Joyce's claim that compliance with her expert's version of the minimum standard of care would have ultimately produced a different outcome.  South Central also alleges that there was no expert testimony as to when Joyce actually developed her subdural hematoma, furthering the allegation that causation was not proved at trial. Further, South Central alleges that Joyce's standard-of-care expert, Russum, was not

7

qualified to testify as to the standard of care or duty owed to a patient experiencing an allergic reaction to contrast dye in a radiology or emergency department given her lack of experience in those specific areas. Finally, South Central argues that because of the insufficiency of Dr. Yeh's testimony and Russum's lack of qualifications as an expert, the trial court's verdict was not based on substantial, credible, or reasonable evidence and is instead contrary to the overwhelming weight of the credible evidence.

¶9. The Mississippi Supreme Court has held that for a plaintiff to establish a prima facie case of medical negligence, he or she must prove each of the following elements: "(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result." *Mid-South Retina LLC v. Conner*, 72 So. 3d 1048, 1050-51 (¶8) (Miss. 2011) (citing *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (Miss. 2009)) (other citations omitted). Further, "medical negligence may be established only by expert medical testimony, with an exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience." *Henson v. Grenada Lake Med. Cent.*, 203 So. 3d 41, 44 (¶8) (Miss. Ct. App. 2016) (quoting *McDonald*, 8 So. 3d at 180 (¶10) (Miss. 2009)). "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must establish that the failure was the proximate cause, or proximate contributing cause of the alleged injuries." *Id*. at (¶10) (quoting *Hubbard v. Wansley*, 954 So. 2d 951, 957 (¶12)

8

(Miss. 2007)).

## I.     Sufficiency of Dr. Yeh's Expert Testimony

¶10.   Dr. Yeh testified as Joyce's treating neurosurgeon and her only causation expert at trial.  South Central argues that Dr. Yeh's testimony was insufficient not only in linking Joyce's subdural hematoma to an alleged breach by the hospital but also insufficient to prove the actual point in time that the subdural hematoma was sustained.  To be successful in a medical negligence case, "A causal connection must be shown between the injuries sustained and the hospital's conduct or actions." *Cavalier v. Mem'l Hosp. at Gulfport*, 253 So. 3d 288, 293 (Miss. 2018) (citing *Powell v. Methodist Health Care-Jackson Hosp.*, 876 So. 2d 347, 348 (¶4-6) (Miss. 2004)).

### A.     Causation

¶11.   Dr. Yeh is a board certified neurosurgeon and Joyce's treating physician at Forrest General.  When Joyce came to Forrest General on August 15, 2012, the day after her allergic reaction, Dr Yeh examined the CT scan of Joyce's brain taken that day and diagnosed her subdural hematoma.  Further, he was the treating physician when she returned to the Forrest General emergency room on September 1, 2012, and was immediately admitted for care.  Dr. Yeh was also the neurosurgeon who performed Joyce's craniotomy on September 1, 2012.  In his deposition recording, which was played at trial, Dr. Yeh testified, "And in my opinion about this case, I felt that the patient, shortly after having the contrast dye, did in fact have some reaction that led to some movements of her head relative to her body with or without contact with the metal gurney or the stretcher, which led to a subdural hematoma, that then

9

led to subsequent craniotomy and treatment." He testified that "I am an expert in working with patients with high-risk problems of the brain, like the subdural hematoma. And I feel that something happened to the patient while she was on the gurney that led to her needing the craniotomy, which I performed." He also testified that he "felt that the patient could have been more optimally managed to prevent self-injury at the time . . . ." He stated that "something happened on the gurney that led to her being compromised . . . ." In its findings of facts, the trial court summarized Dr. Yeh's testimony and stated as follows:

> Dr. Yeh's opinion as the treating neurosurgeon of Ms. Regan is that her subdural hematoma was directly caused by the fact that she was an elderly lady taking Plavix and was anti-coagulated, that she had an allergy to IV contrast and there was the episode while on the stretcher during which she was flailing with convulsive and pseudo-seizure and rapid head movements and the delicate nature of her subdural vein caused her injury.

Dr. Yeh's testimony clearly linked Joyce's subdural hematoma and craniotomy to the involuntary convulsions that took place on the gurney on August 14, 2012. Therefore, we find that there was substantial, credible, and reasonable evidence from Joyce's expert witness regarding causation to support the trial court's decision.

### B. Timing of Injury

¶12. South Central alleges that there was no testimony as to when Joyce developed the subdural hematoma. It argues that the lack of testimony as to the precise timing of the injury "undermines all theories of liability against the hospital." In relation to the timing of the subdural hematoma, Dr. Yeh testified, "Somehow when she was on the gurney because of her movements, she had a subdural develop. That was all I needed clinically. . . ." He further testified, "My goal in this case was to render a professional neurosurgical opinion as

10

to the etiology of the hemorrhage. And more likely than not, it seemed the injury occurred while she was on the gurney." When asked in his deposition about other potential causes of Joyce's subdural hematoma, Dr. Yeh stated:

> Of course if, for instance, it came out later that the patient slipped and fell and hit her head at home and none of us had that information, then that would require another subsequent reevaluation. But you know, those details have not surfaced. No one has really given me an ulterior explanation that would make senses.

Dr. Yeh's testimony unequivocally explained how and when Joyce sustained her subdural hematoma. He linked Joyce's subdural hematoma to her involuntary movements on the gurney while in South Central's care. Therefore, this issue is without merit.

## II.     Qualification of Ka Russum's Expert Testimony

¶13.    South Central argues that Joyce's standard-of-care expert, Russum, lacked the necessary qualifications to testify specifically to the standard of care and duty owed by nurses and CT technicians in the radiology department and emergency department. South Central argues that without qualified expert testimony as to the standard of care, Joyce's medical negligence claim must fail, and the trial court should have granted its summary judgment motion.

¶14.    "[A]n expert must articulate the standard of care that should have been applied in a particular case as an objective standard in order to establish the duty owed to the patient." *Henson v. Grenada Lake Med. Cent.*, 203 So. 3d 41, 45 (¶11) (Miss. Ct. App. 2016) (quoting *Maxwell v. Baptist Mem'l Hosp.-DeSoto Inc.*, 958 So. 2d 284, 289 (¶24) (Miss. Ct. App. 2007)). "It is generally not required that an expert testifying in a medical malpractice case

11

be of the same specialty as the doctor about whom the expert is testifying. "'It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility.'" *Hubbard v. Wansley*, 954 So. 2d 951, 957 (¶13) (Miss. 2007) (quoting *West v. Sanders Clinic for Women P.A.*, 661 So. 2d 714, 719 (Miss. 1995)). When determining the qualifications of a medical expert testifying to the standard of care, "[t]he general rule in medical malpractice actions is that 'a specialist in a particular branch within a profession will not be required.'" *West*, 661 So. 2d at 718. "Absent an abuse of discretion, a judge's determination as to the qualifications of an expert witness will remain undisturbed on appeal." *Hubbard*, 954 So. 2d at 956 (¶11) (citing *Palmer v. Biloxi Reg'l Med. Ctr.*, 564 So. 2d 1346, 1357 (Miss. 1990)).

¶15.    At the time of trial, Russum was the owner of Russum and Associates Consulting Firm from which she worked as a nurse consultant with the family-medicine residency program at Forrest General.  Russum had forty-two years of nursing and nursing-related experience.  For forty of those years, she worked at Forrest General.  The last seven years that Russum worked at Forrest General, she was the director of education.  In that role, she was responsible for the hospital-wide general orientation and was hands-on with "anything that involved patient care."  Further, Russum served on several quality committees, and she served as the chair of a nurse practice committee that evaluated initiatives to monitor and make improvements in the areas of patient safety.  Russum testified that as a part of her service on the nurse practice committee, she worked very closely with the radiology nursing staff.  At the trial, Russum was tendered as an expert in the area of nursing, patient care, and

safety. She was not tendered to testify to any specific expertise in the radiology department, CT scans, or procedures specific to the emergency department. Over objection from South Central, Russum was allowed to testify within the spectrum of nursing, patient care, and safety.

¶16. In preparation for trial, Russum reviewed Joyce's medical records from South Central, the depositions of Jennifer Norman, Marcus Craig, Sarah Plunk, and Dr. Yeh, the affidavit of Dr. David Yeh, the medical records from UMMC, the incident report prepared by Plunk, and the depositions of Joyce and her children, Ken, Melanie, and Sarah. Russum was also privy to testimony presented to the trial court. Russum testified to a reasonable degree of medical certainty that South Central had a duty to protect Joyce from herself and any sudden jerking that could cause harm to her while she was on the gurney in the radiology and emergency departments. She testified further that South Central breached its duty owed to Joyce. Russum testified that South Central breached its duty to Joyce in several aspects including the (1) failure to document Joyce's medical records, (2) failure to communicate, and (3) failure to execute certain precautionary measures to protect Joyce while she was on the gurney.

¶17. Russum testified at length about the lack of documentation in Joyce's medical records. She pointed out the discrepancies in the amount and timing of the Demerol injections administered to Joyce in the radiology department. Some evidence indicated there were two injections given, while other evidence indicated there were three. Further, she testified that there was a lack of information documented in Joyce's medical record as to her location and

care throughout her treatment at South Central and more specifically between 11:20 a.m. and 11:55 a.m. on August 14, 2012. Russum testified that Joyce's medical record lacked any information concerning Joyce's transfer from the radiology department to the emergency department. Russum stated that there should have been some communication between the two departments documented in Joyce's medical record as to the status of her condition and precise timing of the transfer. According to Russum, "[I]t's not those high complex difficult procedures that cause harm to patients. It is lack of communication and teamwork." Russum testified that when transferring patients between departments, "[t]his information may be verbal or written, but it is critical to patient welfare that appropriate pertinent information is shared by caregivers." When asked by counsel if this policy was complied with in the case of Joyce Regan, Russum testified, "No, sir, I did not see any documentation of [a] verbal or written exchange of information." South Central's own expert, Dr. Art Chambers, described Joyce's medical chart as a "paucity of information" and stated that South Central's documentation concerning Joyce's care could have been better.

¶18. Russum also testified as to South Central's failure to execute precautionary measures to ensure Joyce's safety while on the gurney. Russum testified:

> I don't see anything in the record that showed that they did anything to try to protect her while she was doing the shaking and the shivering and the jerking and flailing and all the terms that was used; that she was not monitored continuously; that she was left alone; she was, there again, for the 25 minutes that we don't know where she was. And Jennifer Norman did state in her deposition, as I recall, that she did come and go, so she was left alone.

Russum testified that there were preventive measures that the hospital staff could have taken to protect Joyce, such as placing pillows or padding over the bed rails or just standing beside

14

her while she was on the gurney to prevent her from injuring herself. She testified that "[s]tanding there assisting her to try to stay within the confines that she's not going to hurt herself, going back to your physician and say she's continuing to do this. This comes back to that communication, you know, the medications are not working, you know, she's not getting relief." When asked what should have been done to protect Joyce from herself, Russum testified that somebody should have stayed with her. She stated that having someone stay with Joyce would not have necessarily required a nurse but could have been a CT technician. She testified that Joyce's allergic reaction could have required up to four or five people just to be there to keep her safe. But there was no documentation in her medical chart that indicated she received this kind of monitoring. Finally Russum testified, "We're supposed to be that advocate to keep the patient safe. And this looks like there's a failure there."

¶19. Russum was tendered as an expert in the area of nursing, patient care, and safety. She limited her testimony to general nursing practices concerning patient care, including the documentation of medical records, communication between hospital departments, and patient safety, and she testified that South Central violated the applicable standard of care of nursing practice and patient safety in its care and treatment of Joyce after the allergic reaction. Her testimony was within the realm of her nursing expertise, and we find the trial court did not abuse its discretion by allowing her to testify over South Central's objection.

### III. Weight of the Evidence

¶20. South Central asserts the argument that given the alleged insufficiency of Dr. Yeh's

15

testimony and the alleged unqualified testimony of Russum, the trial court's verdict was contrary to the overwhelming weight of the credible evidence. Within its argument, South Central also attacks the inconsistencies in Joyce's testimony as to her recollection of the events surrounding her allergic reaction and the care that she was given while at South Central. As already discussed above, we find that Russum was properly qualified as an expert to testify as to the duty South Central owed to Joyce and the breach of that duty. Further, we find that Dr. Yeh's testimony was sufficient to show causation between South Central's breach and Joyce's subdural hematoma. No parties dispute that as a result of the subdural hematoma, Joyce required a craniotomy, which led to a lengthy one-year rehabilitation period. Given the sufficiency and admissibility of Dr. Yeh's and Russum's testimony, South Central's argument as to the weight of credible evidence is without merit. Therefore, we find no error in the trial court's verdict in favor of Joyce in the amount of $133,839.42.

*Joyce Regan's Cross-Appeal*

¶21. Joyce argues that the trial court's verdict regarding the amount of damages awarded was inadequate and contrary to the overwhelming weight of the evidence and therefore requires an additur. More specifically, she argues that the $30,000.00[2] the trial court awarded for non-economic damages was inadequate compensation for the trauma that she incurred as a result of her subdural hematoma and craniotomy. But Joyce does not suggest a specific additur amount for this Court to consider.

---

[2] The total judgment of $133,839.42 included $103,839.42 for Joyce's medical bills and $30,000.00 in non-economic damages.

16

¶22. The authority to impose the condition of additur is governed by Mississippi Code Annotated section 11-1-55 (Rev. 2019) and states in part that "an additur can be awarded by the court finding either: (1) the jury or trier of fact was influenced by bias, prejudice, or passion, or (2) the damages awarded were contrary to the overwhelming weight of credible evidence." *Green v. Grant*, 641 So. 2d 1203, 1208 (Miss. 1994). "Each case involving the issue of an additur must "necessarily be decided on its own facts." *Id*. (citing *Leach v. Leach*, 597 So. 2d 1295, 1297 (Miss. 1992)). The scope of review for this Court when considering the necessity of an additur is limited to "determining whether the trial court abused its discretion." *Id*. (quoting *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So. 2d 942, 944 (Miss. 1992)).

> The party seeking the additur has the burden of proving his injuries, damages and loss of income. In determining whether this burden is met, the Court mst view the evidence in the light most favorable to the defendant, giving that party all favorable inferences that reasonably may be drawn from them.

"An additur should never be applied without taking great caution, for an additur represents 'a judicial incursion into the traditional habitat of the jury.'" *Id*. (quoting *Gibbs v. Banks*, 527 So. 2d 658, 659 (Miss. 1988)).

¶23. In the present case, the trial court acted as the finder of fact and judge of witness credibility. The court heard multiple witnesses testify concerning Joyce's allergic reaction and resulting treatment that day, the standard of care in such situations, the breach of that standard, the proximate cause of Joyce's injury and her journey to recovery. That testimony was set forth in the above paragraphs and needs not be repeated here. While Joyce may still be limited in her activities, the testimony presented at trial showed that Joyce had recovered

from her craniotomy. Based on the evidence presented at trial, the trial court awarded Joyce a verdict of $133,839.42. This verdict included $103,839.42, which represented the total amount of Joyce's medical bills incurred as a result of her subdural hematoma treatment. The remaining amount of the verdict, which totaled $30,000.00, represented non-economic damages for the pain and suffering Joyce incurred. As stated previously, this court's review of a denial of additur is limited to "determining whether the trial court abused its discretion." *Id*. (quoting *Rodgers*, 611 So. 2d at 944). "To be clear, . . . neither [the Supreme Court] nor the Court of Appeals 'sits as thirteenth juror.' We do not make independent resolutions of conflicting evidence. Nor do we re-weigh the evidence or make witness-credibility determinations." *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017). As stated previously, when sitting without a jury and as the finder of fact, a trial judge has the sole authority to determine the credibility of witnesses, and his or her findings will not be overturned if supported by substantial, credible, and reasonable evidence. *Id*. (citing *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 20 (¶21) (Miss. Ct. App. 2012)). The trial court heard the evidence in this case over a four-day trial. The trial court is well versed in the law of this State and the requirements of what a plaintiff must prove in a medical malpractice case and the award of damages. Therefore, the denial of an additur was within the trial court's discretion, and this Court does not find an abuse of that discretion. Given the entirety of the testimony presented at trial, we find no error by the trial court and affirm its verdict awarding Joyce a monetary judgment of $133,839.42.

## CONCLUSION

18

¶24.    After review, we find the trial court's verdict was based on sufficient and admissible evidence presented at trial, and, more specifically, the credible expert testimony of Dr. Yeh and Russum.  Further, we find that the trial court's award of monetary damages in this case was supported by the evidence and not clearly erroneous.  Finally, we find there was insufficient proof that the trial court abused it discretion in denying the motion for additur. Therefore, the trial court's decision is affirmed.

¶25.    **AFFIRMED.**

        **BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR.  WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**