# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01099-COA

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**                **APPELLANT**

**v.**

**ISADORE THOMAS, JR.**                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/03/2024 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | J. COLLINS WOHNER JR. JOSEPH GEORGE BALADI COREY DONALD HINSHAW |
| ATTORNEYS FOR APPELLEE: | JOE N. TATUM THANDI WADE RAYMOND PAUL GEE JR. |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND RENDERED - 02/24/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WEDDLE AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. The University of Mississippi Medical Center (UMMC) appeals a judgment of the Hinds County Circuit Court that found UMMC liable under the Mississippi Tort Claims Act for medical negligence in the care and treatment of Isadore Thomas Jr. and awarded him the maximum statutory damage award of $500,000.[1] UMMC claims four points of error on

---

[1] Mississippi Code Annotated section 11-46-15(1)(c) (Rev. 2019) establishes limits of liability for government entities or employees.

appeal, all of which relate to the testimony of Thomas's expert, Dr. Sonny Bal, provided on a condition called calciphylaxis. Of his four arguments, we find the claim that Thomas's expert failed to establish proximate cause to be dispositive. The circuit court erred by relying on Dr. Bal's testimony regarding proximate cause, and therefore we reverse and render judgment in favor of UMMC.

## FACTS & PROCEDURAL HISTORY

¶2.     On November 17, 2020, Thomas, an end-stage renal patient, was admitted to UMMC for a nephrectomy procedure to remove a non-functioning kidney. He remained at UMMC for three days and, as most medical procedures necessitate, Thomas required an intravenous catheter (IV) for fluids. Following this IV placement, Thomas allegedly notified UMMC personnel about pain, redness, and swelling at the site of the IV in his left hand, and he later testified that his complaints were ignored by UMMC staff. Thomas's medical records contained no mention of these complaints. However, his records contained a note from November 18 made by Nurse Erica Chacon that she suspected the IV on Thomas's left hand had infiltrated and that she removed it.[2]

¶3.     Thomas was discharged from UMMC on November 20, but he continued to experience pain and discomfort in his left hand. The pain prompted him to visit his primary care physician, who referred Thomas back to UMMC for inspection of his left hand.

---

[2] Chacon's notation reads: "11/18/20 - IV site at left hand noted to be infiltrated & removed with catheter intact at [3:38 pm]."

2

¶4.     Thomas was admitted to UMMC again on November 24 and stayed through December 1. Thomas testified that he repeatedly complained of pain in his left hand but was told by UMMC staff that such pain was normal and that his condition would improve with time. During this time, Thomas's wife began taking pictures of Thomas's left hand in an attempt to "track" its deterioration. Thomas also said he was never told to apply a warm or cold compress or to elevate his hand. After his second discharge from UMMC, Thomas's hand continued to worsen. He returned to his primary care physician on December 10, and Thomas was subsequently referred back to UMMC for further inspection of his left hand.

¶5.     When Thomas returned to UMMC for the third time in late December, two different physicians determined that he had necrosis of the left hand, and due to the extent and severity of the tissue damage, they recommended that he undergo debridement of the injury, tissue transfers, and graft surgeries. Testing determined that Thomas had developed calciphylaxis[3] in his left hand.

¶6.     On July 29, 2021, Thomas filed a complaint for medical negligence against UMMC and John Does 1-10 in Hinds County Circuit Court. In his complaint, Thomas alleged that the defendants "individually and collectively failed to meet the required standard of care," as they had "failed to timely recognize, diagnose and treat [the] IV infiltration . . . which

---

[3] Calciphylaxis occurs when calcium accumulates in the veins or arteries, causing damage and eventual death of the surrounding tissue. Calciphylaxis is a rare condition caused by a chemical imbalance in the body, and end-stage renal patients such as Thomas are at an increased risk of developing the condition.

caused him . . . needless pain and tissue damage" and resulted in the development of calciphylaxis in his left hand.

¶7.     Thomas designated Dr. Sonny Bal as his expert witness. Bal was board certified in orthopedic surgery and a tenured professor in the Department of Orthopaedic Surgery at the University of Missouri in Columbia, Missouri. Bal was expected to "testify on the nature and extent of the injuries sustained by [Thomas]" and explain how Thomas's injuries—calciphylaxis diagnosis and subsequent permanent injury to the left hand—resulted from "an IV infiltration injury that occurred on November 17, 2020 . . . at [UMMC]."

¶8.     Bal formulated his initial report after reviewing photos taken of Thomas's left hand following the IV stick in November, the medical records UMMC provided, and the depositions of UMMC employees (Dr. Littlejohn and Nurse Erica Chacon). In his report, Bal noted that calciphylaxis is a rare condition, and "[t]he incidence of calciphylaxis in renal dialysis patients [like Thomas] is from $0.04 – 4\%$." Bal also claimed that a "[a] known trigger for the onset of calciphylaxis is an injury, such as a needle stick from IV placement and fluid extravasation from IV infiltration."

¶9.     Bal's report stated that Thomas's calciphylaxis was caused by an IV infiltration of significant duration and that such an injury was "consistent with fluid infiltration under [pain] pump pressure." Bal reasoned that "the misplaced IV line was left in [Thomas's left hand] long enough for the fluid and drug to demarcate a well-defined geographic area." Specifically, Bal asserted that "[b]ut for the errant placement of the IV line in Thomas's left

4

hand, drug infiltration into the soft tissues would not have occurred. Infiltration resulted in the development of calciphylaxis and the need for surgical debridement." Essentially, Bal claimed the development of calciphylaxis and tissue necrosis were the "direct result of IV-line misplacement during [Thomas's] UMMC hospitalization" and caused by the failure of UMMC staff to recognize the problem and promptly remove the IV from Thomas's hand.

¶10. At his deposition, Bal reaffirmed his opinion that Thomas's calciphylaxis was the result of IV infiltration, stating "as a result of the [IV] infiltration, Mr. Thomas subsequently developed . . . calciphylaxis." When asked to explain some of the possible causes of calciphylaxis, Bal replied, "[A] known trigger for the onset of calciphylaxis is an injury, specifically fluid extravasation from an IV infiltration." However, Bal contended that the November 17 "needlestick" (IV) alone did not trigger Thomas's calciphylaxis. When asked how Bal eliminated the "needlestick" as a possible cause of Thomas's calciphylaxis, Bal stated that it was because Thomas "ha[d] survived many needlesticks before and since without [developing] calciphylaxis." Bal also reasoned that "there's no way for [Thomas] to end up with [his injuries] if everything was done right."

¶11. Additionally, Bal claimed that based on the photos he had seen of Thomas's hand, the injuries were consistent with a long-duration IV infiltration under a pain pump. When asked if "any caustic agents" were given to Thomas through the IV, Bal opined, "I don't think [Thomas] had any toxic drug going underneath the skin." Lastly, when Bal was asked "what should UMMC have done different[ly]" to have prevented Thomas's injuries, Bal replied,

5

"[T]hey should have recognized the extravasation earlier and discontinued the IV immediately, as nursing standards call for."

¶12. Despite Bal's opinion that the calciphylaxis was caused by an IV infiltration, he acknowledged that calciphylaxis is "a rare condition" with many possible causes. Bal also stated that "even minimal trauma can precipitate calciphylaxis." Additionally, Bal explained that a confluence of systemic factors, including age, obesity, and metabolic imbalances, which are common in end-stage renal patients like Thomas, could contribute to the development of calciphylaxis. Bal also admitted that calciphylaxis could not be predicted and that the incidences of calciphylaxis developing in renal dialysis patients—like Thomas—is "only .04 to 4 percent." After explaining how rare calciphylaxis was, Bal admitted that calciphylaxis may take time to develop, saying, "[I]t doesn't happen instantly."

¶13. Following Bal's deposition, UMMC filed a motion in limine to exclude Bal's testimony and opinions. After a hearing was held on this motion, the circuit court entered an order denying it. A bench trial began on April 15, 2024, and Thomas tendered Bal as an expert in "IV infiltration and injury from IV infiltration." After voir dire, UMMC renewed its motion to exclude. However, the circuit court denied UMMC's motion and accepted Bal as an expert "as it relates to IV infiltration."

¶14. At trial, Bal was asked about the medicines Thomas received from the IV in his left-hand on November 17, to which Bal replied, "[T]he record [indicates] between November 17th and 18th [Thomas] had high concentration of Dextrose . . . and Calcium Gluconate."

6

Bal testified that both medicines were "appropriate" for Thomas based on his "end-stage renal disease." However, Bal also testified that dextrose and calcium were "vesicant drugs," which are drugs that "will directly hurt, injure, [or] burn tissues; if they get infiltrated."

¶15. After Bal's "vesicant" drug pronouncement, UMMC immediately objected, claiming that Bal was proposing a "new theory" that was never mentioned in his initial report, the Designation of Expert Witness, and contrary to his assertion at the deposition that "toxic drugs [were not] going underneath the skin." UMMC also claimed that allowing Bal to change his testimony would violate Mississippi Rule of Civil Procedure 26 and was "the very definition of trial by ambush."

¶16. In response to UMMC's trial by ambush claim, the circuit court reasoned, "[Y]ou would hope that an expert witness doesn't change their opinion, but it happens. And then you proceed on cross-examination with the fact that, all of a sudden, [the expert] has changed his opinion." Additionally, the circuit court determined that even though Bal was an expert witness, "according to the rules . . . [i]t's just like putting any other witness on this stand. You anticipate their testimony to be one thing and it's different. [Bal's] no different in this respect."

¶17. After the court overruled UMMC's objection, Bal explained the consequences of vesicant drug infiltration, stating, "[V]esicant medicine is not compatible with tissues. . . . [I]t inflames the tissue and runs the risk of causing tissue death, i.e. necrosis." Bal then went on to explain the standard of care for nurses when dealing with suspected IV infiltrations and

7

how UMMC failed to meet this standard. Bal testified that if an IV infiltration is suspected, the IV should be discontinued and disconnected from the patient, and certain "nursing interventions" should be administered, such as applying a hot or cold compress to the IV site and advising the patient to elevate his arm. Bal also opined that the suspected infiltration should be noted in the patient's chart, and hospital staff should monitor the IV site for swelling or redness.

¶18.　Bal stated there was nothing in the UMMC records indicating that any "nursing intervention" or remedial action was taken to address Thomas's complaints of hand pain during the November 17 hospitalization. Thus, Bal claimed that since Thomas was never told to elevate his hand, and no compress was ever applied, UMMC breached the standard of care by failing to properly address his injury.

¶19.　On cross-examination, UMMC asked Bal to explain some of the potential causes of calciphylaxis, and Bal testified that even "a needle stick can produce [calciphylaxis]." He also stated that was a "very rare" medical complication and noted that "[a]ccording to published reports, any trauma preceding . . . calciphylaxis, can set it off." Bal also acknowledged that "end-stage renal disease on hemodialysis poses [an] increased risk of calciphylaxis." In fact, Bal admitted that end-stage renal disease on hemodialysis was the number one risk factor for developing calciphylaxis, and Thomas satisfied this condition.

¶20.　Bal also stated other factors that increase the risk of calciphylaxis, such as obesity, being in the fifth decade of life, hyperphosphatemia, and mineral imbalances within the body.

8

Bal then conceded that Thomas satisfied all the factors for being at an increased risk of calciphylaxis. Additionally, Bal stated that "no single abnormality defines calciphylaxis" and agreed that it could be caused by a "confluence of events."

¶21. After Bal was excused from the stand, UMMC renewed its motion to exclude, but this motion was denied. On September 3, 2024, the circuit court entered a final judgment in Thomas's favor and awarded him $500,000 in damages. The court found "that the standard of care was breached by UMMC in the treatment and management of Thomas's IV infiltration." Furthermore, the court held that "in the record, the evidence established that IV infiltration, coupled with repeated neglect of Mr. Thomas's complaints of hand pain . . . was the proximate and/or contributing cause of the tissue damage that ultimately progressed into calciphylaxis in Mr. Thomas's left hand." Aggrieved by the circuit court's decision, UMMC filed the instant appeal.

## STANDARD OF REVIEW

¶22. "When this Court reviews a trial court's decision to allow or disallow . . . expert testimony, we apply an abuse of discretion standard." *Brown v. Pro. Bldg. Servs. Inc.*, 284 So. 3d 754, 762 (¶30) (Miss. Ct. App. 2017). In reviewing the decision of a trial judge sitting without a jury, "this Court may only reverse when the findings of the trial judge are manifestly wrong or clearly erroneous." *S. Cent. Reg'l Med. Ctr. v. Regan*, 303 So. 3d 432, 438 (¶7) (Miss. Ct. App. 2020).

## ANALYSIS

9

¶23. Although UMMC raises four arguments on appeal, the crux of UMMC's arguments is that the circuit court erred by allowing Bal to serve as an expert witness. Rather than addressing each of these claimed points of error, we address only one: the argument that UMMC is entitled to judgment as a matter of law because Thomas, through his expert Dr. Bal, failed to provide sufficient evidence of causation. We agree and hold that Bal's expert opinion on the cause of Thomas's calciphylaxis was unreliable and inadmissible. Bal's opinion lacked scientific support, relied on speculation, and was inconsistent on the possible causes of Thomas's calciphylaxis. The admission of an unsupported and internally inconsistent expert opinion constitutes an abuse of discretion when causation was an essential element of Thomas's claim. Accordingly, we reverse the judgment of the circuit court and render judgment in favor of UMMC.

## A. Proximate Cause in Medical Negligence

¶24. Our Supreme Court has consistently held that a prima facie case of medical negligence requires a plaintiff to prove four elements: "(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result." *S. Cent. Reg'l Med. Ctr.*, 303 So. 3d at 438-39 (¶9).

¶25. "To prove medical negligence, the expert testimony must establish that the defendant's failure to conform to the required standard of care was the proximate cause, or

10

proximate contributing cause, of the alleged injuries." *Cleveland Med. Clinic PLLC v. Easley*, 287 So. 3d 1038, 1046 (¶20) (Miss. Ct. App. 2019). This evidence is required because "[p]roximate causation is an essential ingredient of a claim of medical negligence." *Cavalier v. Mem'l Hosp. at Gulfport*, 253 So. 3d 288, 293 (¶17) (Miss. 2018).

¶26. Although "Mississippi law does not require a plaintiff to prove causation with certainty[, it does] require proof of causation to a degree of reasonable medical probability that—absent the alleged malpractice—a significantly better result was probable, or more likely than not." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 524 (¶13) (Miss. 2019) (citation omitted). The plaintiff's expert must use specific facts to support his opinion because "[p]roof of causation must not leave the causal connection a matter of conjecture; it must be something more than [just] consistent with the plaintiff's theory." *Smith v. Hardy Wilson Mem'l Hosp.*, 300 So. 3d 991, 998 (¶19) (Miss. 2020).

¶27. Lastly, an expert witness's testimony regarding a defendant's negligence must be admissible. "[T]he Mississippi Supreme Court adopted a test to determine the admissibility of expert witness testimony as stated in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), and as modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Cleveland Med. Clinic*, 287 So. 3d at 1045 (¶18).

¶28. "Under the modified *Daubert* standard, the trial court must perform a two-pronged inquiry—is the testimony relevant, and is it reliable?" *Id.* (quotation marks omitted). "An expert witness's opinion cannot be mere speculation but must be based on the methods and

procedures of science." *Id.* (quotation mark omitted). This Court has explained that "[n]othing is absolutely certain in the field of medicine[, so] the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can [the trier of fact] use that information to reach a decision." *Id.*

¶29. We find that Bal failed to establish that Thomas's calciphylaxis was proximately caused by UMMC's negligence, and the circuit court abused its discretion in finding Dr. Bal's expert opinion on causation was reliable and admissible. Although Bal opined that Thomas's calciphylaxis was caused by an IV infiltration and UMMC's negligent response to the infiltration, his own testimony undermines that conclusion. Essentially, Bal failed to establish—to a reasonable degree of medical probability—that Thomas's calciphylaxis was proximately caused by the IV infiltration and UMMC's subsequent failure to monitor and address the alleged infiltration.

¶30. Bal failed to cite any support in his opinion for the proposition that calciphylaxis cannot occur in the absence of negligence. Stated differently, Bal's testimony failed to show that but for the alleged negligence by UMMC staff, Thomas would not have developed calciphylaxis. At trial, Bal testified that calciphylaxis can be caused by a variety of things and admitted that "[y]ou cannot predict [calciphylaxis]." Bal went on to state that "[a]ccording to published reports, any trauma preceding . . . calciphylaxis, can set it off." He also said that even a "needlestick" could cause calciphylaxis, that "no single abnormality defines calciphylaxis," and that calciphylaxis could be caused by a "confluence of events." However,

12

during his deposition, Bal expressly ruled out the November 17 needlestick as the cause of Thomas's calciphylaxis, reasoning that Thomas "ha[d] survived many needlesticks before and since without [developing] calciphylaxis." This conclusion was based on mere speculation.

¶31. Furthermore, Bal testified that the incidence of calciphylaxis developing in renal patients, without medical negligence of any kind, was roughly 0.04% to 4%. Bal also admitted that the number one risk factor for calciphylaxis was to be an end-stage renal failure patient on hemodialysis, like Thomas. Additionally, Bal acknowledged that aspects of Thomas's medical history, such as his age, weight, internal mineral imbalance, and hyperphosphatemia also put him at an increased risk of developing calciphylaxis. Thus, Bal inherently acknowledged that calciphylaxis has any number of potential causes, but Bal cited to no scientific literature, data, or methodology establishing that an IV infiltration, as opposed to any other potential cause, was more likely than not the cause of Thomas's calciphylaxis. In short, Bal did not support his theory on proximate cause. This was not a case involving a "battle of the experts" as the separate opinions claim but, rather, a case where one expert (Dr. Bal) completely failed to support his proximate cause theory.

¶32. Testimony that an event could have caused an injury, without evidence that it probably did, is insufficient as a matter of law. As previously stated, "[a]n expert witness's opinion cannot be mere speculation but must be based on the methods and procedures of science." *Cleveland Med. Clinic*, 287 So. 3d at 1045 (¶18).

13

¶33.     Bal also failed to establish to a reasonable degree of medical probability that UMMC's failure to conform to the standard of care for suspected IV infiltrations "was the proximate cause, or proximate contributing cause, of [Thomas's] alleged injuries." *Id.* at 1046 (¶20). While it is true that Bal testified regarding the standard of care for suspected IV infiltrations and asserted UMMC breached this standard by failing to administer certain "nursing interventions," such as applying a hot or cold compress to the injection site or elevating Thomas's hand, Bal never explained how these interventions would have prevented Thomas's calciphylaxis. He simply opined that the result would have been different if UMMC had administered "nursing interventions." This testimony is insufficient because "[p]roof of causation must not leave the causal connection a matter of conjecture[.]" *Smith*, 300 So. 3d at 998 (¶19).

### B.     Supplementing Expert Testimony

¶34.     Although it has no bearing on our holding, we note that the circuit court erred as a matter of law by concluding that Bal, an expert witness, was able to change his testimony like any other witness. Under Mississippi Rule of Civil Procedure 26(f), the "[s]easonable supplementation of expert testimony is required." *Inn By the Sea Homeowner's Ass'n. Inc. v. Seainn LLC*, 170 So. 3d 496, 503 (¶18) (Miss. 2015). The goal of this rule "is to avoid unfair surprise and allow the other side enough time to prepare for trial." *Young v. Meacham*, 999 So. 2d 368, 372 (¶16) (Miss. 2008). If an expert witness changes his testimony in a manner that conflicts with prior discovery responses, the sponsoring party has a duty under

14

Rule 26(f) [to] seasonably and formally . . . amend or supplement the response." *Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 758 (¶34) (Miss. 2011). "The failure seasonably to supplement or amend a response is a discovery violation that may warrant sanctions, including exclusion of evidence." *Id.* at (¶33).

¶35. The separate opinions posit that we invade the trial judge's role as fact-finder by making a credibility determination about Bal, but our ruling is not premised on Bal's credibility but, instead, on the lack of scientific support for his claims and his shifting theories of causation. Indeed, Bal's trial testimony varied significantly from both his initial report and deposition.

¶36. For example, during his deposition, Bal opined that toxic drugs were not contained in Thomas's IV. Yet at trial, Bal opined that Thomas was given "vesicant drugs" that expedited his tissue necrosis and increased the development of calciphylaxis, which was a clear change to the subject matter and substance of Bal's prior testimony. In accordance with Rule 26(f), UMMC was entitled to "supplementation on . . . the subject matter on which [Bal was] expected to testify, and the substance of [his] testimony." *Inn By the Sea*, 170 So. 3d at 503 (¶18) (citing M.R.C.P. 26(f)(1)). Thomas's failure to supplement constituted a discovery violation, and the circuit court erred by failing to exclude the evidence.

## CONCLUSION

¶37. After our review of the expert testimony in this case, we find that the evidence was insufficient to establish causation and that the circuit court erred by finding UMMC liable

15

for negligence. Without competent expert proof of medical causation, Thomas failed to meet the essential burden of showing that his calciphylaxis was more likely than not caused by the alleged negligence of UMMC. The admission of an unsupported and internally inconsistent expert opinion constitutes reversible error when causation is an essential element of the plaintiff's claim. Therefore, we reverse and render judgment in favor of UMMC.

¶38.  **REVERSED AND RENDERED.**

**BARNES, C.J., WILSON, P.J., McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J.; WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN IN PART. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; LAWRENCE, J., JOINS IN PART.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶39.  I agree with the majority opinion concerning the discovery issue. However, I disagree with the majority's holding that the expert testimony of Dr. Bal "was insufficient to establish causation[.]" *Ante* at ¶37. This case presents "[c]onflicting expert testimony—often called a 'battle of the experts'—[which] requires the fact-finder to assign credibility." *Est. of Sykes ex rel. Campbell v. Calhoun Health Servs.*, 66 So. 3d 129, 135 (¶27) (Miss. 2011) (citing *Hill v. Mills*, 26 So. 3d 322, 330 (Miss. 2010) (other citations omitted)). In so doing, "trial and appellate courts have separate institutional roles[,] and our role is that of an appellate court and **not** as triers of fact, *ab initio*." *Pittman v. Mem'l Hosp. at Gulfport*, 300 So. 3d 1053, 1060 (¶27) (Miss. Ct. App. 2020) (emphasis added) (citing *Tricon Metals & Servs. Inc. v.*

*Topp*, 516 So. 2d 236, 239 (Miss. 1987)).  Since the trial judge—acting as the fact-finder—determined that Dr. Bal's testimony and report sufficiently proved causation, I respectfully dissent.

¶40.    The plaintiff's expert, Dr. Bal, opined that the ultimate damage to Thomas's hand was caused by IV infiltration that led to tissue damage and, ultimately, calciphylaxis.  In his own words,

> My opinions are that Mr. Thomas suffered, initially, an IV infiltration injury from a pain pump, and that IV was left in place about 24 hours before the infiltration was recognized sufficiently to discontinue the IV.  And as a result of that infiltration, Mr. Thomas subsequently developed a condition called calciphylaxis that was documented on pathology. And as a result of infiltration and subsequent calciphylaxis, he had a full-thickness injury to his skin and subcutaneous tissues, requiring surgery to excise all of the necrotic tissue and required a skin flap to ensure complete wound healing. That's the sum total of my opinions.

Dr. Bal was asked for the basis of his opinion on the IV infiltration injury from a pain pump, and he responded:

> So the entire time the IV was infiltrated, there's a pump that's producing - - that's worsening the infiltration. It's pushing fluid in; the timeline in that the skin necrosis developed later on. It wasn't immediate. Calciphylaxis would not develop immediately in any event.

¶41.    The trial court also stated the following in its final judgment:

> The record included testimony from qualified expert, Dr. Bal, regarding the formation process of an IV infiltration. Dr. Bal testified that IV infiltration is a complication that can occur when an intravenous line, which is intended to deliver fluids or medication into a vein, becomes dislodged or when the vein is compromised. This results in the fluid or medication infiltrating the surrounding tissues rather than entering the vein. Dr. Bal further testified that such incidents typically manifest with symptoms such as swelling, redness, and

17

pain, and that, depending on the nature of the medication administered, tissue damage can occur, as it did in the present case.

As shown in the record, Dr. Bal confirmed that from November 17, 2020, to November 18, 2020, Mr. Thomas received saline and dextrose through his IV, both of which are appropriate for a patient with End Stage Renal Disease. He explained that dextrose, a concentrated form of sugar at 50%, is administered to prevent excessive potassium levels and prevent low blood sugar in renal failure patients. Additionally, Dr. Bal testified that Mr. Thomas was administered calcium gluconate during this period to maintain his calcium and phosphate levels within reasonable ranges. Dr. Bal explained that both calcium gluconate and dextrose are vesicant drugs, drugs that if infiltrated into a vein, can act as irritants, potentially causing inflammation, tissue damage, and necrosis.

Ultimately, the trial court held in Thomas's favor, additionally noting that two other physicians from UMMC "concluded that Mr. Thomas's hand injury and subsequent damage were attributable to the IV infiltration" within the record. The trial court's final judgment details credibility concerns on UMMC's part and what ultimately led to the decision in Thomas's favor.

¶42. The trial judge, sitting as the trier of fact, was tasked with weighing the evidence presented, such as the experts' theories on causation, and reaching a decision. *See Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746-47 (¶25) (Miss. 2008) (stating that "conflicting testimony in the record is to be resolved by the trier of fact" (quoting *Scott Addison Constr. Inc. v. Lauderdale Cnty. Sch. Sys.*, 789 So. 2d 771, 773 (¶8) (Miss. 2001))); *see also City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003) ("[T]he trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses." (citing *Rice Researchers Inc. v. Hiter*, 512 So. 2d 1259, 1265 (Miss. 1987); *Hall*

*v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963))). The trial court ultimately determined that Dr. Bal's causation theory was reliable and correct. With this Court's highly deferential standard of review in mind,[4] I do not believe that the trial court committed reversible error.

**CARLTON, P.J., JOINS THIS OPINION. WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION IN PART.**

**WESTBROOKS, J., DISSENTING:**

¶43. I concur with Judge Lawrence's position that under our deferential standard of review, we should not disturb the circuit court's determination that the expert testimony of Dr. Bal was sufficient to establish causation.[5] By statute, all actions brought under the Mississippi Tort Claims Act are heard via a bench trial, affording our circuit courts extensive experience evaluating the admissibility of expert testimony and then the credibility of that testimony as trier of fact. *See* Miss. Code Ann. § 11-46-13(1) (Rev. 2019). The standard of review our appellate courts apply "to a trial court's decision after a bench trial under the tort claims act is well settled." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023). "A circuit court judge sitting as the trier of fact is given the same deference with regard to his fact finding as a chancellor, and his findings are safe on appeal when they are supported by

---

[4] "If there is substantial supporting evidence in the record," our appellate courts "will not reverse a trial court's findings," even if we "disagree[] with those findings." *Martin*, 994 So. 2d at 747 (¶26) (citing *Scott Addison Constr.*, 789 So. 2d at 773).

[5] Dr. Bal also served as a fact witness, having examined Thomas during a subsequent hospital admission.

19

substantial, credible, and reliable evidence." *Id.* (internal quotation marks omitted) (citing *City of Vicksburg v. Williams*, 294 So. 3d 599, 601 (¶11) (Miss. 2020)). Additionally, "most of the safeguards provided for in *Daubert* are not as essential where a judge sits as the trier of fact in place of a jury." *Sacks v. Necaise*, 991 So. 2d 615, 622 (¶24) (Miss. Ct. App. 2007) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).

¶44. Significantly here, "[i]n a bench trial, the trial court ultimately decides who is deemed champion of the battle of the experts." *Pittman v. Mem'l Hosp. at Gulfport*, 300 So. 3d 1053, 1060 (¶28) (Miss. Ct. App. 2020); *see also Crawford ex rel. Hodge v. E. Miss. State Hosp. Inc.*, 397 So. 3d 871, 878 (¶22) (Miss. Ct. App. 2024). "The trial court has the sole authority in determining credibility of witnesses when sitting as a trier of fact in a bench trial." *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (¶20) (Miss. 2007). The "weighing of expert testimony fall[s] squarely within the trial court's discretion." *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 748 (¶32) (Miss. 2008). I would find that the majority's extensive causation analysis exceeds our proper function as an appellate court.

¶45. Additionally, if a discovery violation did occur, I would find that the error was harmless. Dr. Bal did not base his causation opinion on whether the drugs administered through the IV were vesicant. Dr. Bal's report presumed that the infiltration came from a pain pump, and Dr. Bal stated in his deposition that "it was a little unclear to me what agents [Thomas] was given through the pain pump." The identity of the fluid as vesicant was not relevant to the expert's conclusion that the poorly treated infiltration was the proximate cause

of the injury. More significantly, the circuit court did not find that the calciphylaxis was caused by an infiltration with vesicants. The circuit court concluded that "as reflected in the record, the evidence established that the IV infiltration, coupled with the repeated neglect of Mr. Thomas's complaints of hand pain by both Mr. and Mrs. Thomas to UMMC personnel, was the proximate and/or contributing cause of the tissue damage that ultimately progressed into calciphylaxis in Mr. Thomas's left hand." The circuit court, sitting in a unique position as both gatekeeper and fact-finder, properly weighed the expert testimony and did not commit reversible error in its evidentiary decisions or factual conclusions.

¶46. Because I would affirm the circuit court's judgment, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION. LAWRENCE, J., JOINS THIS OPINION IN PART.**